Ernest J. STOUFFLET, Jr.

v.

CENAC TOWING COMPANY, Inc.

Admiralty—No. 4682, Division "C".

United States District Court
E. D. Louisiana,
New Orleans Division.

Nov. 25, 1964.

Philip Henderson, A. Deutsche O'Neal, O'Neal & Waitz, Houma, La., for libelant.

George B. Matthews, Lemle & Kelleher, New Orleans, La., for respondent.

WEST, District Judge.

This libel is brought by Ernest J. Stoufflet, Jr., owner of the barge ES-2, seeking recovery of the value of the barge which he claims was sunk and lost while chartered to respondent Cenac Towing Company, Inc. The libel is defended on the grounds that respondent, Cenac Towing Company, Inc., was not the charterer of the barge, but was acting only as a broker, and that therefore, it, respondent, is not liable for damages caused by the sinking of the barge while it was actually under charter to Delta Marine Divers, in whose custody it was at the time of the sinking. After hearing the testimony, and after carefully weighing the evidence introduced, it is the opinion of this Court that respondent, Cenac Towing Company, Inc., was, in fact, the charterer of the barge ES-2 at the time of the loss, and that respondent is therefore liable to libelant for the damages caused by the sinking and loss of the barge ES-2. In connection with this holding, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. During all times pertinent hereto, the barge ES-2 was owned by libelant, Ernest J. Stoufflet, Jr.

2. The barge ES-2 was built for libelant by the Siracusa Ship Yard in Morgan City, Louisiana, in January, 1957, at a cost to libelant of $10,800. It was 60 feet long, 24 feet wide, and 5 feet deep, and constructed to handle both deck cargo and water storage below.

3. In May of 1957, libelant delivered the barge ES-2 to respondent's landing in Houma, Louisiana. It was not returned to libelant until January of 1958. During that time, while the barge was in the custody of the respondent, Cenac Towing Company, Inc., libelant was receiving from respondent, for the use of said barge, an average monthly income of approximately $300. Whether this income resulted from the respondent's use of the barge, or whether it resulted from respondent's sub-chartering the barge to others was of no concern to libelant. The monthly payments for the use of the barge were remitted directly from respondent to libelant, and libelant looked to no one other than respondent for the monthly payments for the use of the barge.

4. The charter agreement between libelant and respondent was entirely oral. In accordance with an oral agreement between libelant and respondent, respondent was to keep the barge ES-2 in his fleet, and was to pay libelant the sum of $10 per day for every day the barge was used. It was immaterial to libelant whether the barge was used by the respondent itself, or by someone to whom respondent sub-chartered the barge. It was respondent's obligation, pursuant to an oral charter agreement, to pay libelant the agreed price of $10 per day for each day the barge was in use. Usually, when respondent sub-chartered the barge to others, it charged the sub-charterer $15 per day, out of which respondent remitted the agreed amount of $10 per day to libelant, and respondent retained the

excess of $5 per day. Libelant had no control over the price respondent charged for the sub-charter of the barge. Libelant's only concern was that, pursuant to his agreement with respondent, respondent would pay to libelant the sum of $10 a day for each day the barge was in use. If respondent itself used the barge, it simply paid libelant the sum of $10 per day for each day's use. If it chartered the barge to someone else, respondent remitted to libelant $10 for each day the barge was used out of the total amount received by respondent from the sub-charterer.

5. Libelant did not know, nor did he care, who actually used the barge. He chartered it to respondent and looked entirely to respondent for the agreed charter price.

6. In January, 1958, the barge ES-2 was returned to libelant, who had it metalized by Coastal Marine Industries, Inc., at a cost of $1,836. At the same time libelant had the Bollinger Machine Shop and Ship Yard, Inc. install zinc plates in the sides of the barge and paint the entire barge, at a cost to libelant of $419.58. Immediately after this work was completed, in February, 1958, libelant returned the barge to respondent under the same agreement and arrangements as had been in effect between them prior to January, 1958.

7. Respondent continued to have the custody of the barge, insofar as libelant was concerned, until it was irretrievably sunk and lost in January, 1960.

8. In December, 1959, respondent sub-chartered the barge ES-2 to Delta Marine Divers, who took possession of it from respondent and continued to use it exclusively until it sank in January, 1960.

9. The barge ES-2 was in a seaworthy condition when chartered to respondent by libelant.

10. Respondent voluntarily paid libelant the sum of $310 for the last month that the barge ES-2 was afloat, despite the fact that it, respondent, claims never to have been paid for that period by Delta Marine Divers, to whom respondent had sub-chartered the barge. This payment was made in the same manner that all previous payments had been made, and was in accordance with libelant's oral charter agreement with respondent, i. e., that respondent would pay libelant the sum of $10 for each day that the barge ES-2 was used, either by respondent, or by someone to whom it was sub-chartered by respondent. The payment was made by check drawn by respondent to the order of libelant, as had all payments been made during the entire time the barge was under charter to respondent.

11. After the barge sank, the respondent paid for an unsuccessful attempt to raise it.

12. By agreement and stipulation between counsel, the total cost of the barge ES-2 to libelant, including the cost of building and the cost of metalizing, was the sum of $12,636.

13. The average life of a barge, such as this, varies from 15 to 20 years, and it is customary for the owner of a barge, such as the ES-2, to depreciate the barge on a 15 year basis. In view of the way this barge was maintained by libelant, and in view of the use to which it was put, there is no reason to believe that the life expectancy of this barge would be less than 15 years, even though it might be somewhat speculative to extend its prospective working life to 20 years. Thus, the Court finds, as a fact, that this barge would have a reasonably expected life use of 15 years; that it had been used a period of two years at the time of the sinking, and that thus it had a remaining life expectancy of 13 years.

## CONCLUSIONS OF LAW

1. This is an admiralty suit over which this Court has jurisdiction.

2. Since the respondent, Cenac Towing Company, Inc., obtained from libelant the complete custody, management and control of the barge ES-2, and agreed to and did in fact make certain

agreed rental payments to the libelant for the use of the barge during the entire time that it was in respondent's custody, the relationship between libelant and respondent was one of owner and charterer respectively. It makes no difference that the contract of charter was oral. Benedict on Admiralty, Section 96 (1940); Gilmore and Black Admiralty 172 (1957); Pan American Airways, Inc. v. Quilez, 154 F.2d 496 (CA5 1946); Stockton Sand and Crushed Rock Co., Inc. v. Bundensen, 148 F.2d 159 (CA9 1945); Banks v. Charles Kurz Co., 69 F.Supp. 61 (E.D.Pa.1946).

■ 3. Libelant made out a prima facie case by showing that the barge ES-2 was seaworthy at the time of its charter and delivery to respondent, and that the respondent failed to return the barge to libelant. Respondent has failed to carry the burden of proving otherwise.

■ 4. A demise or bareboat charter, such as the Court has found to exist in this case, constitutes a bailment of the vessel and the charterer or bailee is responsible for any damage to the chartered vessel caused either by its negligence or the negligence of those to whom the charterer sub-charters or otherwise entrusts the vessel. Howard v. Dobbins-Trinity Coal Co., Inc., 111 F. 2d 571 (CA2 1940).

■ 5. While the burden is initially upon the libelant to prove negligence on the part of the respondent-charterer, nevertheless, if libelant shows delivery in good condition of the vessel to the charterer, and that the vessel has been returned in a damaged condition, or has been so damaged as to make return impossible, then a presumption of negligence on the part of the charterer is raised. The burden then rests upon the respondent-charterer to go forward with exculpatory evidence of sufficient weight to overcome the presumption of negligence. New England Foundation Co. v.

Rugo Construction Co., 60 F.Supp. 143 (D.C.Mass. 1945); Tomkins Cove Stone Co. v. Bleakley Transportation Co., Inc., 40 F.2d 249 (CA3 1930).

■ 6. Since respondent has introduced no evidence to rebut the presumption in favor of libelant, a decree for the amount of damages sustained must be entered in favor of libelant. New England Foundation Co. v. Rugo Construction Co., supra.

■ 7. In a case of obvious total loss, as when a vessel is sunk in deep water and either cannot be raised at all or can only be raised at a cost clearly in excess of her value, or when a vessel, although sunk in shallow water is obviously so badly damaged that the cost of repairing her would clearly exceed her value at the time she sank, the owner's recovery is limited to the fair value of the vessel at the time of the loss, to which interest may be added to afford complete indemnity. The Baltimore, 8 Wall. 377, 75 U.S. 377, 19 L.Ed. 463.

■ 8. While there was evidence introduced by respondent to attempt to place the market value of this barge at somewhere between $4,000 and $6,000, this evidence was, nevertheless, not convincing. After taking into consideration the condition of the barge ES-2, the cost of the barge to libelant only two years prior to its loss, the use to which it was put, and the income that had been regularly realized by libelant from the use of the barge, the Court concludes that as a matter of law libelant is entitled to recover the approximate replacement value of this barge which would be, in the Court's opinion, its original cost less two years' depreciation, figured on a life expectancy of 15 years, or the net sum of $10,951.20, together with interest at the legal rate from January 31, 1960 until paid.

Judgment will be signed and entered accordingly.