W.A. HOLLINGER, Jr., Plaintiff,

v.

WARRIOR TOMBIGBEE TRANSPOR-
TATION CO., INC., Defendant.

Civ. A. No. GC81–94–WK–O.

United States District Court,
N.D. Mississippi,
Greenville Division.

Feb. 16, 1983.

Frank S. Thackston, Jr., Greenville, Miss., for plaintiff.

D. Charles Holtz and J. Michael Druhan, Mobile, Ala., for defendant.

## MEMORANDUM OPINION

KEADY, District Judge.

W.A. Hollinger, Jr., plaintiff, a resident of Greenville, Mississippi, brings this admiralty action against Warrior Tombigbee Transportation Co., Inc. (Warrior), defendant, an Alabama corporation domiciled at Mobile, for breach of charter party relating to four barges. Defendant denied liability and counterclaimed for damages claiming misrepresentation and breach of contract by plaintiff. Plaintiff's motion for summary judgment was denied. Following entry of a pretrial order containing numerous stipulated facts, the Court conducted an evidentiary hearing, heard oral argument and has received post-trial memoranda from counsel. The case being ripe for disposition, the Court now makes findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

### Findings of Fact

1. In September of 1980, plaintiff was the owner *pro hac vice* of four open hopper barges, WT 415, M 4, FBL 833 and RT 410, which had been used to transport rock from a quarry at Conway, Arkansas, situated on the Arkansas River, to Baton Rouge, Louisiana. By September 23, the rock cargoes had been unloaded from the barges at Ba-

ton Rouge. All four barges were typical inland river barges, each being 195 feet long and 35 feet wide. Only barge FBL 833 was longitudinally framed; the other three barges were vertically framed.

2. Wilson "Jack" Faulkner, a marine broker of New Orleans, Louisiana, upon learning that plaintiff wished to charter the barges, contacted defendant and was advised that it was desirous of chartering barges to transport coal on the Warrior and Tombigbee Rivers in Alabama.

3. Plaintiff was agreeable to chartering the four barges for a six-month term at $85 per day per barge. This information was communicated to Joe Ollinger, Warrior's president, who emphasized to Faulkner that because of prior experience on the Alabama rivers he was interested only in getting longitudinally framed barges. After being so advised, plaintiff informed Faulkner and Ollinger that he owned or had under his control, other longitudinally framed barges but they were under charter to third parties and hence not immediately available.

4. On or about September 30 or October 1, Ollinger, Ed Wall, Warrior's general manager, and Mike Baxter, marine surveyor, went to Baton Rouge to determine the suitability of the four barges for going on charter to Warrior. Sometime before or upon arrival at Baton Rouge, Warrior personnel learned that only one of the barges tendered for charter was longitudinal. Ollinger communicated his dissatisfaction to Faulkner and plaintiff was immediately contacted. Ollinger informed both plaintiff and Faulkner that Warrior was in a "bind" since it had agreed to load coal on a ship at Mobile without delay and had no barges to render the service. A factual dispute arises in the evidence as to what agreement, if any, was then reached by the parties. According to Ollinger, Warrior could take the barges for one trip, return them and be furnished longitudinal barges by plaintiff for the balance of the six-month period. According to plaintiff, he told Ollinger that Warrior could take or leave the barges as tendered and if Warrior chose to take them on charter, plaintiff would substitute longi-

tudinal barges when and if they became off charter. It was Faulkner's understanding that while Warrior specified only longitudinal barges, Warrior nevertheless took the four barges from Baton Rouge upon plaintiff's promise to provide replacement barges as soon as they might become available. The Court resolves this dispute by finding as a fact that plaintiff did not unconditionally promise to replace the tendered barges with longitudinal barges but agreed only to provide such whenever they might later become available to plaintiff upon expiration of agreements with third parties; and Warrior accepted the tendered barges upon this understanding.

5. Plaintiff and Warrior made an oral charter for a term of six months at a charter hire of $85 per day per barge, with Baxter to make an on-charter survey at the joint expense of the parties, giving Warrior the right to inspect or reject the barges and imposing the duty upon Warrior to insure the barges against hull and P & I loss, with loss payable to plaintiff, and to return the barges at the end of charter, ordinary wear and tear excepted. The charter period began October 2 and expired the following April 2.

6. Before taking the barges, Warrior decided against drydocking them relying upon plaintiff's statement that they had been laying under load in the rock trade for a period of some months immediately preceding their tender. Upon inspection, however, Ollinger and Wall learned that the barges were old, having had about twenty years of service, that they had numerous holes in side plates and hoppers, that hulls had patches and water was present in several tanks of each barge. At the Baton Rouge inspection, the barges were empty and their sides were exposed to view; these obvious deficiencies were observed by Warrior's personnel and also noted in the Baxter survey. Though they were old and required more care and attention than newer barges, plaintiff's barges were as fit for carrying coal as they had been for transporting rock.

7. Notwithstanding the known physical deficiencies, Warrior took the barges and placed them in the tow of the M/V GEISMAR on October 2.

8. On November 7 Warrior returned FBL 833 and M 4 to Baton Rouge and on November 16 WT 415. Charter hire on the three barges was paid through November 1. Charter hire was also paid to that date on RT 410 although that barge, while in tow of the M/V GEISMAR, sank on October 13. The barge was a total loss and hull underwriters paid plaintiff full value of the barge.

9. Upon returning the three barges to Baton Rouge, Warrior notified plaintiff it still needed and wanted barges but would accept only longitudinal barges. Warrior tendered the three barges back to plaintiff, and a joint off-charter survey was conducted at time of delivery to plaintiff at Baton Rouge. No longitudinal barges became available to plaintiff until sometime after the expiration of the charter term of April 2.

10. Shortly after the redelivery of the three barges, plaintiff offered to settle his claims and terminate the charter party if Warrior would pay one month's additional rent. This offer was refused by Warrior. Thereafter plaintiff made no effort whatever to recharter the barges to others for the balance of the six-month term.

11. The demand for chartering barges of any type, vertical or longitudinal, was brisk throughout the months of September, October, November and December 1980. The market for chartering barges continued to remain good until the commencement of the coal strike in the early spring of 1981, which caused the demand to fall off substantially. During the ninety-day period following Warrior's return of the barges, plaintiff could have rechartered them to others for the same rental, $85 per day per barge, had he wished to do so. Plaintiff, however, elected not to place them with a broker or make any effort at all to charter them until May and June 1981 when they were chartered to the Northern Power Company for coal transport. At trial plain-

tiff freely acknowledged that he could have chartered the barges upon their return to him and that the demand for barges was such that he could have obtained the same rental from other parties. Plaintiff abstained from taking such action out of fear that he might be sued by Warrior if the barges were not kept available for Warrior, upon Warrior's demand at any time within the six-month period. Plaintiff sought to justify his inaction by relating a prior experience in which he had been sued by a party who had changed his position on purchasing a vessel held under option agreement. His reasoning was that although he was successful in the prior suit, the litigation had nevertheless caused him inconvenience and the expense of defense and that he did not want to be exposed to a claim by Warrior that he failed to keep the barges for its account.

12. The Court finds as a fact that prudence dictated that plaintiff, upon Warrior's surrender of the three barges and its refusal to further honor the charter party, make some good-faith, diligent effort to mitigate his damages and that it was unreasonable for him not to make any effort whatever to recharter the barges elsewhere. He knew there would be little, if any, difficulty in placing almost without delay the barges in useful service and thereby derive rental equivalent to Warrior's obligation in an undeniably strong market for barge owners interested in chartering their vessels. That plaintiff offered to terminate the charter party upon Warrior's payment of one month's rent is strongly supportive that he had an almost ready market for them. The reason that plaintiff ascribes for taking no action of any kind—out of a concern that he should hold the barges for Warrior's account—is flatly contradicted and inconsistent with the previous acts and declarations of Warrior, and plaintiff's inaction was unbusinesslike, if not irresponsible. The Court further finds on practically undisputed evidence that plaintiff could have substantially reduced his claims against Warrior through reasonable efforts on his part; and that within forty-five days after the return of each barge, plaintiff could

have surely feasibly negotiated one or more charters to other parties which would have yielded to him at least $255 daily ($85 × 3) for the remainder of the charter term.

13. Plaintiff rechartered the three barges to Northern Power Company in the same condition as at the time of Warrior's surrender and without making repairs, alterations or improvements to them. Northern Power Company as charterer has at all times since then kept the barges in the active service of transporting coal. Although Warrior had preferred longitudinal barges for its service on the relatively narrow channels of the Warrior and Tombigbee Rivers, the barges which plaintiff delivered and accepted by Warrior at Baton Rouge were suitable and reasonably fit for service on the Warrior and Tombigbee Rivers as much as on other inland waterways, provided ordinary inspections by experienced mariners were made and reasonable care taken to maintain them free of water accumulation since the barges were admittedly old and had been subjected to heavy use over a period of years. The Court finds as a fact that at all relevant times plaintiff's four barges were seaworthy and suitable for the purposes intended by the charter party with Warrior.

14. The oral charter agreement did not provide for termination in case of damage or loss of the barges during the term, or for the cessation or reduction in charter hire in case of the sinking of a single barge. Capital Marine, owner and operator of the M/V GEISMAR, chartered the vessel and crew to Warrior under a fully found charter agreement, paragraph 13 of which expressly stated that Capital Marine was to operate the vessel as an independent contractor. No details as to the cause of the sinking are disclosed by the evidence other than a statement by a member of the crew that the tugboat pilot could have avoided the casualty by beaching the barge in shallow water had he taken timely action when he was first advised that the barge was taking on water.

The Court incorporates by reference all of the stipulated facts contained in the Pre-

trial Order which are not expressly contained herein.

### Conclusions of Law

█ 1. Plaintiff established an oral charter party, complete in all essential terms, for a six-month period at a specified daily charter hire and it is a valid and binding obligation between the parties. Pursuant to the agreement, Warrior entered into sole and exclusive possession of the four barges in issue on October 2, 1980, making the demise extend for a period expiring April 2, 1981.

█ 2. Although an implied warranty of seaworthiness usually arises upon an owner's delivery of his vessel to the charterer, Warrior as the charterer placed no reliance on plaintiff's judgment about the condition of the barges. Plaintiff's only representation, which was true, was that the barges had just come off the rock trade. Although this statement induced Warrior not to incur the expense of drydocking, Warrior personnel nevertheless, in company with a marine surveyor, made a thorough and complete investigation of each barge and were aware of all significant deficiencies before accepting the vessels. The deficiencies of the barges were patent or easily discoverable by the inspections carried out by Warrior personnel and the marine surveyor, and they knew before acceptance that the barges had holes that needed patching and would likely leak water when loaded unless standard corrective measures were taken. Warrior's acceptance of the barges after full inspection and knowledge of their true condition waived any right it may have to rely on an implied warranty of seaworthiness so that Warrior cannot now be heard to complain of their unsatisfactory condition. *Sanford & Brooks Co. v. Columbia Dredging*, 177 F. 878 (4th Cir.1910); *cf. Dempsey v. Downing*, 11 F.2d 15 (4th Cir. 1926). Additionally, the facts found by the Court establish that the barges were in fact seaworthy when accepted on charter by Warrior. Although they were neither new nor without defects, they were reasonably suited for transportation of rock, coal or similar material on the inland rivers, a trade in which they were regularly used both prior to and after the charter period in controversy. Measured by the type of cargo, the duration of anticipated voyage, and reasonable foreseeable maritime perils that the charterer might encounter, the four barges are deemed to be seaworthy. *Texaco, Inc. v. Universal Maritime, Inc.*, 400 F.Supp. 311 (E.D.La.1975); *Petition of Mahoney*, 255 F.Supp. 310 (D.C.N.H.1966). Warrior has failed to show that the barges were in fact deficient for the use intended and its preference for longitudinally framed barges in plying Alabama rivers falls far short of establishing that the three vertical barges and the one longitudinal barge in issue were in fact unsuitable for use.

█ 3. Warrior's refusal to pay charter hire beyond November 1 for the three barges returned to plaintiff was a breach of agreement for which Warrior is liable in recoverable damages. Plaintiff committed no breach of the charter party, or of any warranty of seaworthiness and made no misrepresentations of any kind to justify an award of damages to Warrior against the plaintiff.

█ 4. The failure of plaintiff to attempt to charter the three returned barges, despite his evident ability to reduce damages substantially, requires the Court to consider the application of the rule of avoidable consequences. *Restatement (Second) of Contracts* § 350 (1979) provides:

(1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.

(2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss.

The foregoing rule applies in admiralty cases for breach of charter. "The party injured by breach 'cannot recover damages which arise by reason of his own inactivity or imprudence, and are not the natural con-

sequences of the default of the other party." *Glidden Co. v. Hellenic Lines, Limited,* 315 F.2d 162, 164 (2d Cir.1963). In *Ainesworth Coal & Iron Co. v. Trafikaktiedolaget Grangesberg Oxelosund,* 287 F. 291, 296 (4th Cir.1923), the Fourth Circuit stated the correct rule for estimating damages in such cases is "[t]he shipowner is entitled to the net amount that would have been earned under the charter sued on, less the net amount actually earned, or which might, with reasonable diligence, have been earned, by the vessel during the time required for the voyage named in such contract of charter." *See also Aaby v. States Marine Corp.,* 107 F.Supp. 484, 486 (S.D.N.Y.1951). The Fifth Circuit has commented on the rule of avoidable consequences in two cases, *Southport Transit Company v. Avondale Marine Ways,* 234 F.2d 947 (5th Cir.1956), and *Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 598 F.2d 930 (4th Cir.1979). Plaintiff relies on both of these cases to excuse him from the consequences of his failure to act at all to reduce damages. *Southport's* teaching is that the wrongdoer (such as Warrior) has a substantial and heavy burden to establish that prudence called for action by the injured party (such as plaintiff) and that had action been taken the resulting damage would have been substantially different. 234 F.2d 954. *Tennessee Valley Sand & Gravel Co.* addressed the issue of whether the actual efforts by the injured party to avoid loss were reasonable, with the court concluding that efforts to raise the sunken barge were reasonable under the particular circumstances. The latter case is clearly inapplicable since plaintiff made no efforts at all to reduce loss, and we find that his failure to act at all was clearly unreasonable and without any factual foundation. Defendant, however, has met the requisite burden imposed by *Southport* by clearly showing that ordinary prudence called for plaintiff to act to avoid or reduce his loss since such was entirely feasible and practicable and could have been accomplished by plaintiff without undue risk, burden or humiliation. Moreover, the clear proof is that had plaintiff made diligent and good faith efforts to

recharter the three barges, the resulting damages which he claims from loss of charter hire would have been substantially reduced. In view of the clear proof, it would be inequitable to allow plaintiff to recover charter hire on the three returned barges for any period of time beyond that which the proof shows would have been necessary to list the barges with a broker or otherwise advertise them for charter, for procuring a new charter for the balance of the period at rentals no less than what Warrior had agreed to pay and for getting the barges to an agreed location for on-charter survey and acceptance by another. This could have been easily accomplished, in our view, within forty-five days after the date of the barges return, so that plaintiff may not claim damages beyond that date, and his demand for charter hire must be reduced accordingly.

 5. Plaintiff's claim for loss of charter hire on the sunken barge, RT 410, stands on a different footing. Warrior contends that since the barge was sunk during the early portion of the charter period and plaintiff received from the marine underwriter the full value of the vessel, the loss of the barge suspended Warrior's promise to pay charter hire since it ceased to be in existence, relying upon the doctrine of impracticability or impossibility of performance. Warrior further contends that Capital Marine, an independent contractor, not Warrior, was at fault in permitting the barge to sink. The settled rule in admiralty as regards the payment of charter hire for a fixed term admits no such exception where the parties have themselves failed to provide in their agreement for the cessation or abatement of charter hire as a result of injury or loss to the vessel during the charter period. It is well settled that under a demise or bareboat charter as here "rent is payable until the end of the stipulated term and the return of the vessel." *United States v. Shea,* 152 U.S. 178, 188, 14 S.Ct. 519, 522, 38 L.Ed. 403 (1894); *United States v. Cornell SS Co.,* 267 U.S. 281, 45 S.Ct. 239, 69 L.Ed. 613 (1925); *Ohio Valley Engineering Co. v. Barges OVE 102 and 103,* 214

F.Supp. 784 (E.D.La.1963). It is to be noted that in the two cited United States cases the Government sought unsuccessfully to be relieved of the charter hire accruing after the loss of the charter vessel until the end of the charter party. Warrior's contention that the payment to the owner of the value of the vessel upon loss ignores the contract right that the owner and the charterer each had to hold the other to the agreement notwithstanding the injury or loss of the vessel. A case exonerating the charterer from further payment following total loss because of the provisions in the charter party as well as the doctrine of impracticability of performance may be found in *Asphalt International, Inc. v. Enterprise Shipping Corp.*, 514 F.Supp. 1111 (S.D.N.Y.1981). That case is obviously distinguishable on its facts from the situation that is presented here.

6. The Court rejects the contention that Warrior should be relieved of paying charter hire because the evidence does not show that it negligently caused the sinking of plaintiff's barge or, alternatively, that the sinking was caused by negligence of an independent contractor for which Warrior should not be responsible. We reject this view for two reasons. First, Warrior's obligation to pay charter hire until the end of the period arises from contract and not because of tortious conduct. Secondly, it is well settled that a demise or bareboat charter constitutes a bailment of the vessel, rendering the charterer or bailee liable for any damage to, or loss of, the chartered vessel caused either by its own negligence or the negligence of those to whom the charterer sub-charters or otherwise entrusts the vessel. *Howard v. Dobbins-Trinity Coal Co., Inc.*, 111 F.2d 571 (2d Cir.1940); *Stoufflet v. Cenac Towing Company*, 236 F.Supp. 198 (E.D.La.1964). It is sufficient for us to adopt the following language of the Second Circuit in *Howard*, 111 F.2d at 572:

[T]he libellant proved delivery in good condition and return by the charterer in damaged condition. He thereby made a prima facie case and became entitled to the benefit of a presumption of fault by the bailee or by those to whom it had entrusted the barge. The burden then rested upon the bailee to go forward with evidence to overcome the presumption by showing that the damage was not caused by its negligence or the negligence of those for whose conduct it was responsible.

In this case, Warrior failed to present evidence sufficient to overcome a presumption that loss through sinking of barge RT 410 was caused by its negligence or the negligence of those to whom it entrusted the vessel. Warrior's defense to the payment of charter hire for the barge after its loss is without merit, and must therefore be denied.

7. The Court computes damages recoverable by plaintiff as follows:

| For Barge FBL 833 | | |
|---|---|---|
| Prior to return (6 days at $85 per day) | $ 510 | |
| Subsequent to return (45 days at $85 per day) | 3,825 | $ 4,335 |
| **For Barge M 4** | | |
| Prior to return (6 days at $85 per day) | 510 | |
| Subsequent to return (45 days at $85 per day) | 3,825 | 4,335 |
| **For Barge WT 415** | | |
| Prior to return (15 days at $85 per day) | 1,275 | |
| Subsequent to return (45 days at $85 per day) | 3,825 | 5,100 |
| **For sunk Barge RT 410** | | |
| From November 2 to April 2 (150 days at $85 per day) | | 12,750 |
| | | |
| Total Damages | | $ 26,520 |
| The above sum shall bear prejudgment interest from January 1, 1981, through February 15, 1983, calculated at 8.65% per annum, the rate fixed pursuant to § 302 of the Federal Courts Improvements Act, P.L. 97–164, effective October 1, 1982. | | 4,877 |
| | | $ 31,397 |

Let judgment issue accordingly.