**EDISON STEAMSHIP CORPORATION**

v.

**EASTERN MINERALS, Inc.**

**EDISON STEAMSHIP CORPORATION**

v.

**5,691.74 TONS OF SALT AND/OR SUPER PHOSPHATE, MORE OR LESS, and Eastern Minerals, Inc.**

Civ. A. No. 58–1026,

Admiralty No. 58–43.

United States District Court
D. Massachusetts.

Oct. 31, 1958.

Myron Boluch, Boston, Mass., for plaintiff.

James A. Whipple, Boston, Mass., for defendant.

WYZANSKI, District Judge.

These are companion cases, one in admiralty, the other at law. Both assert claims, for consecutive periods of time, for charter hire of the S. S. Edison Mariner, at the rate of $1,800 a day.

July 30, 1958 the shipowner, Edison Steamship Corporation and Eastern Minerals, Inc., a Boston company of which David F. Mahoney is president, entered into a time charter, on government form 138, covering the hire of the S. S. Edison Mariner. [Ex. 1.] The parties struck out certain clauses from the standard government form of time charter. But they left among other paragraphs the following relevant provisions:

"4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of Eighteen Hundred Dollars ($1800) * * * per day or pro-rata for part of a day * * *.

"5. Payment of said hire to be made in New York * * * semi-monthly in advance.

"6. That the cargo * * * be * * * discharged in any dock or at any wharf or place that Charterers * * * may direct * *.

"8. That the Captain * * * shall render all customary assistance with ship's crew and boats. The

Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency * * *.

"11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing * * *.

"15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost * * *.

"18. That the Owners shall have a lien upon all cargoes * * * for any amount due under the Charter * * *.

"23. * * * all winches to be at Charterers' disposal during loading and discharging; steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay owners for all officers and crews overtime working cargo * * *."

Pursuant to the charter, the shipowner provided Eastern Minerals Co., Inc. with the S. S. Edison Mariner for use in New Orleans beginning on August 21, 1958. Eastern loaded in Louisiana a full cargo of salt for New Haven and Boston. On this first voyage, Eastern used its own employees and cranes to discharge the vessel at Boston.

Then, in accordance with Eastern's direction, the vessel sailed back to New Orleans and Tampa, Florida. In New Orleans she loaded a cargo of salt and in Tampa she loaded super phosphate. The ship discharged part of its cargo in New Haven. Eastern directed the vessel to proceed to a dock near its premises at 37 Marginal Street, Boston. The S. S. Edison Mariner arrived at Chelsea and on September 30, 1958 at 2 p. m. began to discharge.

Immediately on the vessel's arrival, the International Longshoreman's Association, a labor organization which had no contract relations with Eastern but which was seeking to organize Eastern's employees and to represent them in collective bargaining with Eastern, threw a picket line outside the gate of Eastern's premises and in front of its dock. The I. L. A. had no dispute with, or relations with, the shipowner. But the members of the crew of the S. S. Edison Mariner, because of the picket line, declined to make steam available to the winches, to operate any booms on the vessel, or in any way to participate in the unloading of the vessel.

Thereupon the officers of Eastern themselves and some other persons used an Eastern crane and cranes which Eastern procured from third parties to unload the salt at Chelsea.

■ If there had been steam in the winches, and if the crew had been willing to work the booms, it would have been possible physically but at great inconvenience and with probable loss of salt to unload the salt at the Chelsea dock by using the winches and booms. Such use of the winches and booms in Chelsea by Eastern would have been unprecedented. And, as a fact, the Court finds that Eastern would not have used the winches and booms had they been available.

Orally, on or about October 2, Mahoney, as president of Eastern, asked the Captain to sail the vessel from Chelsea to New Haven with a view to unloading the salt in Connecticut and thus escaping the consequences of the picket line. However, no order was given in writing in accordance with paragraph 11 of the time charter. And neither by usage nor otherwise had the shipowner waived the stipulation that directions should be in writing. Indeed telegrams later sent by the charterer indicate that it knew that a writing was indispensable to a binding direction.

The captain of the vessel, knowing his crew would be unlikely to sail the vessel

to New Haven for the purpose of avoiding the pickets, did not respond favorably to Mahoney's oral request.

Then Mahoney on October 2 telegraphed the Captain to move the vessel at the Chelsea dock to a berth 20 feet forward to the Eastern premises. Later Mahoney made additional oral requests for a change of berthing on October 7 and 14. However, the Captain, mindful of the crew's unwillingness to help Eastern's officers in their attempts to minimize the effects of the I. L. A. pickets, did not move the vessel. But the officers of Eastern, using their own assistants, by labor which took only 2½ hours did move the vessel on October 13 to the berth that they regarded as appropriate.

From September 30 to October 7 the Masters, Mates, and Mariners Union, a labor organization to which some of the crew of the S. S. Edison Mariner belonged, did strike against the owners of certain vessels. But this strike was in no way a cause of, a motive for, or a fact in any way related to the unwillingness of the crew of the S. S. Edison Mariner to make steam available to the winches of the S. S. Edison Mariner, to operate its booms, to move it from one berth to another, or to participate in the unloading of the salt.

The charterer, Eastern, not having paid on September 30 to the shipowner the prepayable charges then due from Eastern to the shipowner, the shipowner brought in this Court on October 2, 1958 a libel for such sums then due. Simultaneously, the shipowner requested the United States Marshal to attach the vessel and cargo and prevent the vessel from discharging the cargo. The Marshal took the requested action on October 6 at 18:30 p. m. And the Marshal's deputies continued to prevent the discharge of cargo until October 7, at 12:30 p. m., when the shipowner informed the Marshal that further stoppage of discharge of cargo was not desired.

On October 15 at 10:15 a. m. the shipowner filed a complaint seeking to recover charter hire and other items which in its view had been incurred by the charterer since October 2 when the libel was filed. The complaint was filed at a time when, under the terms of the time charter the charter hire for October 16 (the day after the complaint) was already due and payable.

October 16, 1958 the S. S. Edison Mariner was finally completely unloaded, and the charter terminated. Until the very end of the unloading, the I. L. A. continued to picket Eastern.

Upon the basis of the foregoing facts this Court rules as a matter of law as follows:

1. It was proper for the shipowner and the captain to bring the vessel to Chelsea on September 30. Eastern had given an order to the captain to sail to that port. And Eastern cannot, and indeed does not, complain of the arrival of the vessel at Chelsea.

2. It was proper for the shipowner and the captain not to take the vessel from Chelsea to New Haven in October when Eastern's president suggested that course. The president made no formal written demand for such a transfer. There had not been by usage or otherwise any waiver of the requirement that instructions be in writing. The charterer thus failed to meet the express condition specified in paragraph 11 of the charter party.

3. It was not a breach of the shipowner's undertaking when the crew of the vessel declined to make steam available for the winches, to operate the booms, to move the vessel to another berth, or to participate in the unloading. The reason it was not a breach is twofold. First, the cause of the crew's unwillingness was attributable to what, from the point of view of the time charter, (regardless of what it may have been from the point of view of the Massachusetts state labor relations law, M.G.L.A. c. 150A, § 1 et seq.,) was a dispute between the charterer itself and a union seeking to represent its own employees. Thus, it was a condition attributable to business activities of the charterer, not the shipowner. Second, the time charter did not

provide an excuse to the charterer for non-payment in cases where a delay in unloading was caused by a picket line, strike, or similar labor controversy. United States v. Czarnikow-Rionda, 2 Cir., 40 F.2d 214, 216; New York & Cuba Mail S. S. Co. v. Lamborn, D.C.S.D.N.Y., 8 F.2d 382, 385, modified, 2 Cir., 13 F.2d 535.

The grounds for non-payment were clearly specified in paragraph 15 of the time charter. No reference was made to strikes or picket lines. The type of excuses listed were of an entirely different nature. And, although there was added to the listed grounds specified, a general phrase "loss of time * * * by any other cause preventing the full working of the vessel", that clause must be interpreted in the light of the familiar *ejusdem generis* canon of construction. However widely it may be stretched, the clause does not cover a loss of time attributable to labor activities directed solely at conditions in the charterer's enterprise. Inclusio unius exclusio alterius.

4. Even if the preceding conclusion is erroneous, and there had been a breach by the shipowner of its obligations under the time charter, the breach did not prejudice the charterer. This Court has found as a fact that Eastern would not have used at Chelsea booms and winches to unload its salt there. And had it done so, there is no evidence indicating that such use of winches and booms would have been as expeditious or satisfactory as the cranes which Eastern actually used. So far as concerns the failure of the captain to move the ship to another berth, there is no evidence that the 2½ hours Eastern took to move the ship to a better berth was any longer than would have been taken by the crew of the vessel if it had effectuated the transfer as requested.

5. The time from 18:30 p. m. October 6 until 12:30 p. m. October 7

when the owner of the cargo was prevented from discharging because of the marshal's attachment seems at first to be an appropriate deduction from the charges payable to the shipowner. However, on reflection this will appear an unsound impression. If the owner of the cargo is precluded from discharging because he is impeded by an attachment against his goods procured at the suit of a third person, the cargo owner would not be excused *pro tanto* from paying for the use of the vessel during the period of the attachment. The legal situation is not different *merely* because the attachment here was at the suit of the shipowner. The only additional point that must be considered in connection with a shipowner's as distinguished from a stranger's attachment is whether the attachment was warranted by a valid claim. Here that point is quickly answered. The shipowner had a valid overdue claim against the cargo-owner-charterer. Thus it was the fault of that cargo-owner-charterer in failing promptly to pay his just debts that was the actual and legal cause of the attachment he suffered. And, therefore, the charterer cannot be heard to complain.

6. It having been stipulated, in accordance with Exhibit I, that the shipowner is in any event to recover from the charterer certain miscellaneous items there enumerated as items 2 to 7 inclusive, and it following from the preceding findings and conclusions that the charterer is also liable to the shipowner for charter hire for the period claimed in the libel and in the law suit, (a total of 15 days, 17 hours, and 40 minutes, that is from September 30, 1958 to October 16, 1958 at $1,800 per day), a decree shall enter for the libellant plaintiff, in accordance with Exhibit I for $36,168.34 together with interest from the dates the items were due, payable, and demanded. The other prayers of the libel and complaint, so far as they are consistent with this opinion, are also granted.