**MONTAUK OIL TRANSPORTATION CORP., Plaintiff–Appellee,**

v.

**SONAT MARINE, INC., and Getty Refining and Marketing Company, Defendants,**

**Sonat Marine, Inc., Defendant–Appellant.**

**No. 147, Docket 88–7401.**

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 1988.

Decided March 17, 1989.

Mary T. Reilly, New York City (Hill, Betts & Nash, Eli Ellis and Kenneth Geller, New York City, of counsel) for defendant-appellant.

Richard V. Singleton, II, New York City, (Healy & Baillie and William F. Losquadro, New York City, of counsel), for plaintiff-appellee.

Before VAN GRAAFEILAND, CARDAMONE and PIERCE, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Sonat Marine, Inc. appeals from a judgment in favor of Montauk Oil Transportation Corp. which followed a non-jury trial before Judge Carter in the United States District Court for the Southern District of New York. The judgment, which was for charter hire, was in the total amount of $496,660.80, representing a principal amount of $317,274.61 and interest of $179,386.19. For the reasons that follow, we affirm that part of the judgment which imposes liability on Sonat but remand to the district court with instructions to reduce the amount of the principal award to $196,274 and the interest to $111,248.10 for a total award of $307,522.10, otherwise the judgment to remain the same.

In 1981, both Montauk and Sonat were engaged in the transportation of petroleum products by tug and barge. Montauk's employees were members of Local 333 of the United Marine Division of the International Longshoremen's Association. Sonat's employees were members of the Seafarers International Union. On July 1, 1981 Sonat's employees went on strike. On July 2, 1981 Glenn Shaw, a Montauk supervisor, hearing of the strike, offered William Schade, a Sonat manager, the charter hire of two tugs and barges during the strike. The offer was accepted. Although the charter party was completely oral, it is undisputed that it provided for a daily rate of $11,500 plus fuel and port charges, delivery and return at New York City. Unfortunately, the charter party contained no exceptions relating to the strike, and it was that failure which led to this litigation.

Getty Refining and Marketing Company, one of Sonat's regular customers, had a refinery in Delaware City, Delaware, and on July 7, 1981 Getty was expecting the arrival of a load of oil on its ship, the M/T HERON. Because the HERON's draft was too deep to permit direct unloading, Sonat was hired by Getty to perform the necessary lightering services. Sonat directed Montauk's barges to undertake this task on its behalf.

In an effort to avoid possible confrontations with Sonat's striking union, Shaw instructed his supervisory personnel to represent that Montauk's agreement of hire was with Getty, not Sonat. Montauk also indicated on its records that Getty was the other contracting party. However, Seafarers International was not misled. When the first of Montauk's two barges, the NORFOLK, took on a load of fuel from the HERON and headed for port, it was met by Seafarers' picket boat and was forced to anchor when NORFOLK's crew refused to cross Seafarers' "picket line". At about the same time, the other barge, the SAVANNAH, which was in the process of lightering the HERON, discontinued the unloading process on instructions from Local 333. Shaw ordered the SAVANNAH to pump the oil back into the HERON and return to New York, which it did. The NORFOLK remained at anchor until July 29.

On July 21, relying on Shaw's false averment that Montauk was employed by Getty, Montauk filed charges with the N.L.R.B. claiming that Seafarers was engaged in a secondary boycott in violation of 29 U.S.C. § 158(b)(4)(i), (ii)(B). On July 29, Local 333 permitted the NORFOLK to proceed to the Getty refinery in exchange for Montauk's agreement to withdraw its charges. As appears from the caption in this suit for charter hire, Montauk named Getty as a party defendant. The district court not only dismissed the claim against Getty; it also awarded Getty attorneys' fees on the ground that the suit against Getty was "baseless".

The claim against Sonat, which is reflected in the district court's judgment, may be broken down as follows:

| | |
|---|---|
| Charter hire for the SAVANNAH — | $ 38,763.21 |
| Charter hire for the NORFOLK — | 265,737.40 |
| Fuel charges — | 12,774.00 |
| Total | $317,274.61 |

Sonat denied the claim for the SAVANNAH in toto on the ground that it "did not perform at any time under the charter." It offered to pay $2,421.89 for fuel consumed in towing the NORFOLK to and from the HERON and $34,451.70 for the NORFOLK's work prior to and following the extended anchorage, i.e., lightering the HERON and discharging at the terminal. Sonat's check for $36,873.59 "in full payment" of Montauk's services was returned by Montauk, and this litigation followed.

Sonat concedes, as it must, that the contract between the parties contained no express exception for strike delays.

> Q. Isn't it true, Mr. Schade, when you had the conversation with Mr. Shaw where you agreed to this time charter that you did not make any agreement whatsoever with him that time would stop due to strike delays?
>
> A. It's correct. I did not make a specific agreement that time would stop.

Sonat attempts to read a strike exception into the contract by implication, relying upon this Court's statement in *Asphalt International, Inc. v. Enterprise Shipping Corp., S.A.*, 667 F.2d 261 (2d Cir.1981), that "in maritime cases, when the parties fail to allocate a risk by terms of the contract, courts look to certain time-honored doctrines to determine who shall bear the loss." *Id.* at 265. However, time-honored maritime doctrines related to strike delays generally place the burden on the charterer, not the owner. *See, e.g., United States v. Czarnikow-Rionda Co.*, 40 F.2d 214, 216 (2d Cir.), *cert. denied*, 282 U.S. 844, 51 S.Ct. 24, 75 L.Ed. 749 (1930); *Yone Suzuki v. Central Argentine Ry.*, 27 F.2d 795, 804 (2d Cir.1928), *cert. denied*, 278 U.S. 652, 49 S.Ct. 178, 73 L.Ed. 563 (1929); *New York & Cuba Mail S.S. Co. v. Lamborn*, 8 F.2d 382, 385 (S.D.N.Y.1925), *modified on other grounds*, 13 F.2d 535 (2d Cir.1926); *Compagnia Di Navigazione Mauritius Rome v. Kulukundis*, 182 F.Supp. 258, 263 (E.D. N.Y.1959), *aff'd*, 277 F.2d 161 (2d Cir.1960); *Edison Steamship Corp. v. Eastern Minerals, Inc.*, 167 F.Supp. 601, 604–05 (D.Mass.1958); *United States v. Atlantic Refining Co.*, 112 F.Supp. 76, 80 (D.N.J. 1951); *Continental Grain Co. v. Armour Fertilizer Works*, 22 F.Supp. 49, 53 (S.D.N. Y.1938). The district court correctly held, therefore, that the burden was on the charterer in the instant case. We conclude, however, that while this makes Sonat fully liable for the charter hire of the SAVANNAH, Sonat should not be required to bear the entire burden for the extended delay of the NORFOLK.

The proof is undisputed that within hours after the NORFOLK was stopped by the picket boat Shaw was told by Local 333's union delegate that he "could take the cargo back to the ship and discharge it." Later in the same day, Shaw was given the same choice by Local 333's secretary-treasurer. The record is undisputed that Local 333 never refused to permit the NORFOLK to return its oil to the HERON. Indeed, because replacing the oil taken from the HERON so as simply to restore the status quo ante does not appear to be a job "fairly claimable by the bargaining unit" of Sonat's employees, it is doubtful that Seafarers International Union would have chanced a possible claim of secondary boycott by attempting to prevent such replacement. *See Frito–Lay, Inc. v. Retail Clerks Union Local No. 7*, 629 F.2d 653, 658–63 (10th Cir.1980); *Local Union No. 98 of Sheet Metal Workers' Int'l Ass'n v. NLRB*, 433 F.2d 1189, 1192–97 (D.C.Cir. 1970).

In any event, the record is clear that one of Schade's three suggestions to Shaw for resolving the picketing problem was to "[p]ump back to HERON." The district court's finding that Local 333 rejected this proposal is clearly erroneous. Shaw's statements to Schade that the union refused him permission to pump the oil back on the HERON also were "clearly erroneous." The record speaks clearly and strongly to the contrary:

> Q. Did he or anybody from your union ever tell you that you could not pump back the cargo into the HERON?

A. No. At this time they did not.

Q. At any time?

A. At any time, I don't believe so.

Testimony of Shaw, Tr. 59–60.

■ Although a court sitting in admiralty is not a traditional court of equity, by now the law is well established that an admiralty court may use equitable principles where appropriate to avoid injustice. *See Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.,* 339 U.S. 684, 689–90, 70 S.Ct. 861, 865, 94 L.Ed. 1206 (1950); *Schoenamsgruber v. Hamburg American Line,* 294 U.S. 454, 457, 55 S.Ct. 475, 476, 79 L.Ed. 989 (1935); *Tradax Ltd. v. M.V. Holendrecht,* 550 F.2d 1337, 1338–39 (2d Cir.1977). Such principles may be resorted to for the purpose of making an equitable and just award of damages. *United States v. Peavey Barge Line,* 748 F.2d 395, 399 (7th Cir.1984); *United States v. Motor Vessel Gopher State,* 472 F.Supp. 556, 559 (E.D.Mo.1979), *aff'd,* 614 F.2d 1186 (8th Cir.1980). In the instant case, Shaw's failure to advise Schade of the possibility that Shaw could repump to the HERON and return his tug and barge to New York makes it inequitable and unjust for Montauk to recover full hire for the twenty days that the barge and tug sat idle. This may be likened to the legal doctrines of "avoidable consequences" and "mitigation of damages", neither of which bind us to the clearly erroneous standard of review. *See Federal Insurance Co. v. Sabine Towing & Transp. Co.,* 783 F.2d 347, 350–51 (2d Cir.1986); *Ellerman Lines, Ltd. v. The Steamship President Harding,* 288 F.2d 288, 289–92 (2d Cir.1961).

Whatever doctrine of mitigation we look to, we conclude that Montauk should not recover the full hire for the NORFOLK and its tug during the twenty days they sat idle. Because Sonat failed to incorporate an appropriate exception clause in the charter party, it must of course bear the initial responsibility for the wasted period. On the other hand, Shaw's misstatement to Sonat concerning the possibility of pumping back to the HERON and terminating the charter makes Montauk equally responsible for the almost three weeks of delay that followed. We conclude, therefore, that the expenses resulting from this period should be apportioned equally between the parties. *See Hollinger v. Warrior Tombigbee Transp. Co.,* 572 F.Supp. 1291, 1293–96 (N.D.Miss.1983); *Coca Cola Co. v. SS Norholt,* 333 F.Supp. 946, 949–51 (S.D.N.Y.1971). Recalculating the damages on this basis, we arrive at the following figures:

| Charter rentals | | |
| --- | --- | --- |
| SAVANNAH | — | $ 38,763.21 |
| NORFOLK | | |
| 2.9958 days at full hire | — | 34,451.70 |
| 20.0802 days at half hire | — | 115,461.15 |
| Fuel charges | | |
| full cost | — | 2,421.89 |
| 50% cost—20 days | — | 5,176.05 |
| Total | — | $196,274.00 |

We remand to the district court with instructions to amend the judgment appealed from so that the principal award in Montauk's favor will be $196,274 and the interest from December 31, 1981 to April 12, 1988 will be $111,248.10, for a total award of $307,522.10, plus the trial costs already awarded. No costs on appeal shall be allowed either party.