659 So.2d 1141 (1995)
HILTON OIL TRANSPORT, et al., Appellant,
v.
OIL TRANSPORT CO., S.A., Appellee.
No. 94-560.
District Court of Appeal of Florida, Third District.
August 9, 1995.
Rehearing Denied September 27, 1995.
*1144 Mitchell, McAlpin & Associates and Richard McAlpin, for appellants.
Keller, Houck & Shinkle and Patrick E. Novak and Vincent O'Brien and John Keller, for appellee.
Before BARKDULL, LEVY and GREEN, JJ.
GREEN, Judge.
Hilton Oil Transport ("Hilton Oil") and Percy C. Overman ("Overman"), defendants below, appeal from an adverse final judgment entered against them and in favor of Oil Transport Co., S.A. ("O.T.C.") after a bench trial. O.T.C. cross appeals that portion of the final judgment assessing attorneys' fees against O.T.C. as well as denying prejudgment interest to O.T.C. for its damages for breach of contract.

BACKGROUND
O.T.C., the plaintiff below, is a Dominican Republic corporation which leases tug boats for hire. Hilton Oil is a Cayman Islands corporation based in Miami and Overman is *1145 its managing director and primary owner. Hilton Oil operated out of an office occupied by various other corporate entities owned and/or controlled by Overman. Aside from Overman, Hilton Oil's only other employees were two pumpmen.
Overman operated Hilton Oil and his other corporate entities in a very informal manner. For example, Hilton Oil's debts were usually paid by other entities owned by Overman without any notes or other financial records documenting such loans; Overman rarely, if ever attended board meetings; written minutes were rarely made of critical decisions made by the board members.
In 1989, Hilton acquired its sole asset, a 250 feet barge named "Hilton", from Overman. The barge was capable of transporting petroleum products but needed extensive refurbishing. It was subsequently towed by a tug to Jacksonville, Florida for repairs. Overman personally invested approximately $800,000 for such repairs, $560,000 in the form of a loan to Hilton Oil. Hilton Oil gave Overman a note and mortgage on the barge to secure the loan.
In August 1990, after the repairs were completed, a company known as Rio Energy contacted Hilton Oil for the purpose of chartering the barge Hilton to ship asphalt from Venezuela to Honduras. On August 30, 1990, Hilton Oil and Rio Energy entered into an agreement for the barge Hilton to transport the asphalt in two consecutive voyages to Honduras. Thereafter, Rio Energy entered into a sub-charter agreement with Comision Administradora Del Petroler ("C.A.P."), an agency of the Honduran Government, for the transportation of the asphalt on substantially similar terms as the Hilton Oil/Rio Energy Charter.[1] The agreement and the subcharter agreement contained a provision for the arbitration of all disputes between these parties.
Hilton Oil needed a tug to tow its barge for the voyages to Venezuela and approached O.T.C. to lease a tug. On August 31, 1990, Hilton Oil entered into an agreement with O.T.C. to lease or charter the tug Elizabeth from O.T.C. The charter hire or rental fee was fixed at $1300 per day and all fuel, lube oil and port charge expenses were to be borne by Hilton Oil. According to this agreement, the tug Elizabeth was to tow the barge Hilton from Puerto Rico (where the barge was currently located) to Caracas and from there to Honduras and back. Unlike the Hilton Oil/Rio Energy/C.A.P. agreement, the agreement between Hilton Oil and O.T.C. contained no arbitration provision.
The barge Hilton and tug Elizabeth arrived with the first load of asphalt in Puerto Cortes, Honduras in mid-September 1990. At that time, however, a commercial dispute over the discharge temperature of the asphalt developed between the operators of the barge and C.A.P.[2] On October 16, 1990, C.A.P. decided to send the barge to Puerto Castilla, Honduras for discharge because it was thought that the shore line there would be more favorable for discharge. The tug and barge arrived at Puerto Castilla on October 18 and resumed heating the asphalt using shore power. On October 21, the receiving agent for the government there advised that it was shutting down the barge's operations because asphalt was foaming in the shore tank and there was fear of a possible "boil over" on the shore. The government's receiving agent there then advised the barge's operators that it would not accept the remainder of the asphalt. Subsequently, C.A.P. directed the port authorities to detain both the vessel and the tug in port while the Honduran government began attachment proceedings. Both the barge Hilton and tug Elizabeth were named in this legal proceeding. Ultimately the barge was allowed to resume its discharge operations and was able to complete the same on November 3, 1990.
*1146 Upon the discharge of the cargo, the Honduran government informed Hilton Oil that the barge and tug would still be detained and not allowed to set sail.[3] Approximately one week later, a severe storm swept through Puerto Castilla and the barge broke away from its mooring and was effectively destroyed. The tug Elizabeth, on the other hand, survived the storm.
After the destruction of the barge, Overman brought a foreclosure action against Hilton Oil on the note and mortgage in the United States District Court for the Southern District of Florida. Alternate directors for Hilton Oil authorized a shareholder of the company named Andrew Giovenco to confess judgment on behalf the company in this action. As a result, Overman readily obtained a monetary judgment in his favor against Hilton Oil for $633,000.
Additionally, Overman filed a claim on behalf of Hilton with the hull insurer of the barge. The insurer was instructed to forward the proceeds of the insurance claim to Overman and Associates, another entity owned by Overman in Miami which had informally made loans to Hilton Oil in the past. When the insurer failed to pay, litigation ensued in the United States District Court for the Southern District of Florida and Hilton Oil was awarded $747,993.11. This judgment is currently on appeal by the insurer.
In November 1990, Hilton Oil instituted arbitration proceedings against both Rio Energy and C.A.P. for damages incurred as a result of the detention and loss of use of the barge. Hilton Oil asserts that, as part of its claims in this arbitration proceedings, it sought recovery for O.T.C.'s loss of use of the tug as well.
On April 9, 1993, the arbitrators entered their Final Award finding that detention of the barge and tug to be wrongful by the Honduran government and awarding Hilton Oil $1,055,171.53 plus post judgment interest for, among other things, its damages for the loss of use of the barge up to the date anticipated for the completion of the second voyage for the delivery of the asphalt. Neither the arbitrators nor the final award addressed O.T.C.'s claims against Hilton Oil. The arbitration award was later confirmed as a final judgment. See In re Consolidated Arbitration between Hilton Oil Transport against Rio Energy Int'l, Inc. and between Rio Energy Int'l, Inc. against Comision Administradora Del Petroleo, No. 93 Civ. 2900, 1993 WL 256714 (S.D.N.Y. July 6, 1993) (unpublished).
Meanwhile, during the pendency of the arbitration proceeding, O.T.C. submitted its final invoice to Hilton Oil in the amount of $796,400 on April 1, 1992.[4] When Hilton Oil failed to pay, O.T.C. commenced the action below against both Hilton Oil and Overman personally for breach of the charter agreement.
The parties proceeded at a bench trial below and the court entered final judgment in favor of O.T.C. and against Hilton Oil and Overman for $562,981.00. This represented the daily charter hire rate up to the date of the release of the tug less a set off in the sum of $200,00.00 which represented O.T.C.'s pro rata share of Hilton Oil's attorneys fees incurred in the arbitration proceeding plus an uncontested set-off in the sum of $33,419.00. The trial court denied prejudgment interest to O.T.C. on its claim on equitable grounds.
Hilton Oil and Overman appeal this judgment on the grounds that: (1) the Honduran government's wrongful detention of the barge and tug frustrated its charter agreement with O.T.C.; therefore as a matter of law, Hilton Oil was relieved of its obligation to pay charter hire to O.T.C.; (2) even if Hilton Oil is liable for charter hire to O.T.C., its liability should be limited up to the anticipated date of completion of the second voyage, just as Hilton Oil's recovery was limited in its arbitration proceeding with Rio Energy and C.A.P.; and (3) the trial court erred in disregarding Hilton Oil's corporate entity or "piercing the corporate veil" to impose personal liability against Overman. O.T.C. has *1147 filed a cross appeal asserting that the trial court erred (1) in assessing a pro rata share of Hilton Oil's attorneys' fees incurred in the arbitration proceeding against Rio Energy and C.A.P.; and (2) denying prejudgment interest to O.T.C. on its breach of contract claim against Hilton Oil.

I. MAIN APPEAL

A. COMMERCIAL FRUSTRATION

Hilton Oil's first argument on appeal is that the trial court's award of the full charter hire to O.T.C. for the entire sixteen month period that O.T.C. was without the use of its tug was error. Hilton Oil asserts that its charter with O.T.C. was commercially frustrated both by the detention of the barge and tug as well as the subsequent destruction of the barge by the storm. Therefore, Hilton Oil argues that as a matter of law it was thereby relieved of any obligation to pay the charter hire. We conclude that the charter was not commercially frustrated by the seizure of the barge and tug as a result of the commercial dispute with the local port authorities but we do find that the charter was subsequently frustrated by the loss of the barge during the storm. Hence, we find O.T.C. was entitled to its charter hire up to the date of the destruction of the barge.
Generally speaking, the doctrine of commercial frustration is predicated upon the premise of giving relief in a situation where the parties could not provide themselves by the terms of the contract against the happening of subsequent events, but it does not apply where the intervening event was reasonably foreseeable and could and should have been controlled by provisions of such contract. L.N. Jackson & Co. v. Lorentzen, 83 F. Supp. 486 (S.D.N.Y. 1949):
To establish the defense of frustration it must appear that the one asserting it had not been instrumental in bringing about the intervening event either by positive action or acquiescence, and the act of government which is alleged to have frustrated the performance of the contract must be one in its sovereign capacity, a vis major or in the nature of a vis major.
Id. at 490 (citations omitted).
In the context of a contract for charter hire either of a ship or of the sailors and officers to man the ship we initially note that we must look to general maritime law which is the governing substantive law. Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); Thomas Schoenbaum, Admiralty and Maritime Law § 9-1 (2d ed. 1987); Grant Gilmore & Charles L. Black, Jr., The Law of Admiralty § 4-1 (2d ed. 1975). Commercial frustration in the maritime context has been characterized thusly:
When an unexpected event completely deprives the parties to a charter of an essential precondition to their performance, the charter may be declared dissolved and the parties relieved from further performing it. Such an event is typically a permanent loss of use or destruction of the vessel. Three elements are normally necessary for application of the doctrine of frustration or commercial impracticability: first, the event giving rise to the claim must be totally unexpected and unforeseeable; second, the risk of the event must not be provided for, either by the language of the charter party or by custom; and third, the performance of the contract must be impossible or commercially impracticable.
Schoenbaum, supra at 663-64; see also, Texas Co. v. Hogarth Shipping Corp., 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123 (1921); Transatlantic Financing Corp. v. United States, 363 F.2d 312 (D.C. Cir.1966).
Based upon these requirements, we cannot conclude as a matter of law that the government's seizure of the tug and barge as a result of a commercial dispute with Hilton Oil frustrated the charter venture so as to relieve Hilton Oil of its obligation to pay any charter hire to O.T.C. because the first two criteria were not met. First, although the governmental seizure may have been totally unexpected by Hilton Oil, it was not unforeseeable. The arrest and detention of a chartered vessel based upon commercial disputes are not unusual occurrences in maritime commerce. See, In Re Arbitration between Ouse Shipping Co., Ltd. as Owner of the M/S *1148 Sea Ranger and Unimarine as Charterer, S.M.A. 1240 (Arb.N.Y. 1978) (where a charter vessel was arrested by government officers as security for claims they had with the charterer and/or the vessel, arbitrations found that the defense of commercial frustration did not relieve charterer of its obligation to pay hire for the period the vessel was under arrest); See also In Re Arbitration between Rederi K/S Merc-Scandia and Kirk Line, Ltd., S.M.A. 2509 (1988) (where chartered vessel was seized and detained when numerous bales of marijuana were found aboard by customs officials and owners failed to post the requisite bond for the release of the vessel, charterer remained liable for hire even though both owner and charterer were completely innocent of illegal activity); Fed. R.Civ.P. Supplemental Rules for Certain Admiralty and Maritime Claims.
We also find that the second requirement for the defense of frustration (i.e. the risk of event not provided for by contract or custom) cannot be satisfied in Hilton Oil's favor. Admittedly, the charter party agreement between the parties failed to allocate the risk of a seizure or delay. In the absence of such a provision, however, the custom in maritime commerce appears to impose the risks associated with the arrest, delay or detention of a chartered vessel on the charterer, even where the charterer is free of fault. See Sea Ranger, S.M.A. at 1245; Rederi, S.M.A. at 2514; see generally In re Arbitration between Econolines, Inc. and Mohammed Al-Haddad and Sahib Al-Haddad d/b/a Al-Haddad Bros. Enterprises, 1980 A.M.C. 424 (Arb.N.Y. 1979) (although neither the charterer or vessel owner expected the Iraqi government to default on its contractual obligation to purchase asphalt from charterer or that the Iraqi government would direct the chartered vessel carrying the asphalt not to enter the named discharge port within that government's territory, the defenses of "supervening impossibility" and "restraint of princes" were not available to the charterer to excuse its charter hire obligation); Montauk Oil Transp. Corp. v. Sonat Marine, Inc. and Getty Refining and Marketing Co., 1989 A.M.C. 1147, 871 F.2d 1169 (2d Cir.1989) (shipowner entitled to recover hire from charterer for delay caused by strike).
Our research has simply failed to disclose any legal authority (and Hilton Oil has cited to none) to support Hilton Oil's argument that the government's seizure of a charter vessel as a result of a commercial dispute during non-war times will constitute frustration of the charter hire as a matter of law. Indeed, the defense of frustration as a result of a governmental seizure of a vessel has generally only been successful when the seizure occurred during times of war or in anticipation of war. See e.g. Texas Co., 256 U.S. at 619, 41 S.Ct. at 612 (where a British vessel, prior to its start of a chartered voyage from Texas to South Africa, was taken over by the British government for war related purposes, the charter hire was deemed frustrated before the time for performance and the parties were thereby excused from performance); Wong Wing Fai Co., S.A. v. United States, 840 F.2d 1462 (9th Cir.1988) (charter party was commercially frustrated on April 30, 1975 when the ship was commandeered by 110 fleeing South Vietnamese soldiers when South Vietnam fell to the North Vietnamese); The Frankmere, 262 F. 819 (E.D.Va. 1920) (charter contract frustrated when the government took possession of the ship for wartime purposes). It is obvious that war time seizures are unforeseeable and the parties to the charter hires have absolutely no control over such seizures and are thus at the total mercy of the government. We do not think that the same can be said of a governmental seizure during non-war times which occurs due to a commercial dispute with one of the parties to the charter hire. The fact that an arbitration panel found the government's seizure and detention to be wrongful does not alter our conclusion.
Although we have concluded that the charter party was not frustrated by the seizure of the barge and tug, we must, nevertheless, find that the charter was frustrated and thereby terminated by the subsequent destruction of the barge by the storm. When an unexpected event such as the permanent loss of use or destruction of the vessel completely deprives the parties to a charter of an essential precondition to their performance, it is well settled that the charter may be declared dissolved and the parties *1149 relieved from further performance of it. The Tornado, 108 U.S. 342, 2 S.Ct. 746, 27 L.Ed. 747 (1883); Asphalt Int'l., Inc. v. Enterprise Shipping Corp., S.A., 667 F.2d 261 (2d Cir.1981); Schoenbaum, supra at 663. See Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365 (5th Cir.1983).
In summation, we find the charter party was not terminated by the governmental seizure of the barge and tug but was effectively terminated by the subsequent destruction of the barge. Thus, Hilton Oil was obligated to pay charter hire to O.T.C. up to the date of the destruction of the barge and it was error for the trial court to award O.T.C. its daily charter hire rate for the entire sixteen months that it was without the use of its tug.

B. ARBITRATION ARGUMENT

Hilton Oil's second argument on appeal is that since it effectively represented O.T.C.'s interests in the arbitration proceedings with Rio Energy and C.A.P., O.T.C. is bound by the arbitration findings. Thus, according to Hilton Oil, O.T.C. is entitled to recover only its pro rata share of the arbitration amount recovered by Hilton Oil. Specifically, in the arbitration proceedings, Hilton Oil sought to recover loss of use damages for the seizure and detention of its barge through the date of arbitration. The arbitrators, however, found that Hilton Oil could recover loss of use damages only up to the expected completion date of the second voyage contemplated under the agreement between Hilton Oil/Rio Energy/C.A.P. In re Consolidated Arbitration between Hilton Oil Transport against Rio Energy Int'l, Inc. and between Rio Energy Int'l, Inc. against Comision Administradora Del Petroleo, No. 93 Civ. 2900 (S.D.N.Y. July 6, 1993) (unpublished). Hilton Oil maintains on appeal then that O.T.C.'s recovery for charter hire must also be limited accordingly. We disagree.
First of all, we note that unlike the Hilton Oil/Rio Energy/C.A.P. contract, the agreement between Hilton Oil and O.T.C. contained no provision as to an expected completion date of the charter nor did it contain an arbitration provision for resolution of disputes between Hilton Oil and O.T.C. More importantly, however, O.T.C. was not a party to the Hilton Oil/Rio Energy/C.A.P. contract containing the arbitration clause. Generally speaking, arbitration is strictly a matter of agreement or consent between the parties. See In re Keystone Shipping Co. and Texport Oil Co., 782 F. Supp. 28, 29 (S.D.N.Y. 1992), 1992 A.M.C. 1768, 1769 ("arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not so agreed to submit"); U.S. v. $100,000 in U.S. Currency, 602 F. Supp. 712, 716 (S.D.N.Y. 1985) ("By consenting to arbitration a party relinquishes certain rights and safeguards provided by the judicial system, but if the party does not so consent, it retains such rights and should not be bound by an arbitration award."); Lay Cee Corp., Division of EFKA Plastic Corp. v. M.V. Anastasios, 1986 A.M.C. 2304, 2305 (Arb.N.J. 1986) ("arbitrat[ion] ... binds not only the original parties, but also those who subsequently consent to be bound by its terms"). A fortiori, a complete stranger to an arbitration clause cannot be bound by an award made against it. In re A/S Ganger Rolf v. Zeeland Transp., Ltd., 191 F. Supp. 359, 362 (S.D.N.Y. 1961)
Although Hilton Oil did utilize invoices furnished by O.T.C. in the arbitration proceeding to support its claims against Rio Energy and C.A.P., the trial court correctly found that O.T.C. was not a party to the arbitration. Indeed, O.T.C. could not have properly been made a party to or participated in the arbitration proceeding since O.T.C. had previously executed a release in favor of the Honduran government to secure the return of its tug. We find that Hilton Oil's suggestion on appeal that it represented O.T.C.'s interests in the arbitration to be completely belied by the fact that O.T.C. initiated the suit below against Hilton Oil to collect its damages while the arbitration proceedings were still in progress.[5] Such action is certainly inconsistent with any intention or desire on the part of O.T.C. to have its dispute with Hilton Oil resolved in the arbitration proceeding.
*1150 Hilton Oil nevertheless argues that since O.T.C. voluntarily supplied Hilton Oil with certain necessary documentation to support Hilton Oil's claims for purposes of the arbitration proceeding, O.T.C. is now estopped from claiming in the action below that it is entitled to more than a pro rata share of the arbitration award. In support of this argument, Hilton Oil relies upon the decisions of Universal Am. Barge Corp. v. J-Chem., Inc., 946 F.2d 1131 (5th Cir.1991); SCAC Transport (USA) v. S.S. Danaos, 845 F.2d 1157 (2d Cir.1988); and Kidder Elec. of Florida, Inc. v. U.S. Fidelity and Guar. Co., 530 So.2d 475 (Fla. 5th DCA 1988). We find these cases to be factually distinguishable from the case sub judice and Hilton Oil's reliance upon them is, therefore, misplaced.
In each of these decisions, it was found that a nonparty indemnitor or surety to an arbitration proceeding involving its indemnitee or principal could be "vouched in"[6] to the arbitration proceeding so as to preclude the indemnitor or surety from relitigating issues decided in the arbitration proceeding in a subsequent action if the indemnitor's or surety's interests were adequately represented in the arbitration. See Universal Am. Barge Corp., 946 F.2d at 1140 (although a defendant could be vouched into an arbitration by virtue of an indemnity action, the court reversed, however, a finding that the defendant was bound by the arbitration proceeding where the defendant's interests were not fully and fairly represented in the arbitration due to a conflict of interest with indemnitee); SCAC Transport, 845 F.2d at 1163 ("absent a particularized showing of prejudice, a stevedore may be vouched into arbitration under a charter party by a charterer where the stevedore is the charterer's indemnitor"); Kidder Elec., 530 So.2d at 477 (while surety never agreed to arbitrate any claim against it on its bond, bond litigation stayed nevertheless since the surety's principal (contractor) agreed with the subcontractor to arbitrate what is essentially the same claim).
Hilton Oil's argument that O.T.C. must be deemed to have been "vouched into" or "bound by" the arbitration proceeding fails, we think, for three reasons. First, Hilton Oil and O.T.C. do not have an indemnitor/indemnitee or principal/surety relationship. Second, Hilton Oil was the petitioner not the respondent to the arbitration proceeding. By definition, vouching is a procedure to be utilized by civil defendants, not plaintiffs. See n. 6. We have found no authority where a party seeking affirmative relief has been permitted to "vouch in" another party seeking affirmative relief in a proceeding.
Finally, we conclude that the arbitration decision has no effect on O.T.C.'s litigation below where the arbitrators made no findings on O.T.C.'s entitlement to charter hire pursuant to its agreement with Hilton Oil. See Amalgamet Inc. v. Underwriters at Lloyd's, 724 F. Supp. 1132 (S.D.N.Y. 1989) (where arbitration issue concerned only insured's negligence with respect to duties owed to shipowner pursuant to charter party and not to issue of insured's duty under the policy, insurer not collaterally estopped from disputing arbitration panel's finding that insured was no more than ordinarily negligent in subsequent litigation); Lubrizol International, S.A. v. M/V Stolt Argobay, 562 F. Supp. 565 (S.D.N.Y. 1982) (where an earlier arbitration award in vessel owner's favor did not have res judicata effect with respect to charterer's claim that vessel owner, not charterer, was responsible for water contamination to cargo since arbitration panel did not rule on the particular cause of action before the court in the subsequent proceeding, and in fact, expressly refused to rule on individual claims for cargo damage.); see also, Maralada Compania Naviera v. American Hull, 648 F. Supp. 1001 (S.D.N.Y. 1986) (insured not foreclosed from relitigating issue of who was responsible for fire on board a vessel where arbitrator's finding on that issue was only *1151 incidental to the issue to be determined by arbitration). In Hilton Oil's arbitration proceeding with Rio Energy and C.A.P., the issues to be resolved were essentially whether the barge and tug were wrongfully arrested or detained as a result of the commercial dispute with the Honduran officials and the amount of monetary losses sustained by Hilton Oil as a result of the detention. Although Hilton Oil included O.T.C.'s claims in its damage claims against Rio Energy and C.A.P., it is clear that this issue was merely incidental to the central issues before the arbitrators.
Thus, we find that the trial court did not err in declining to limit O.T.C.'s recovery in accordance with the finding made by the arbitrators.

C. IMPOSITION OF PERSONAL

LIABILITY ARGUMENT
In the final judgment under review, the trial court not only imposed judgment in favor of O.T.C. against Hilton Oil, but it imposed judgment against Overman personally as well. Overman argues on appeal that absent evidence that the corporation was organized or utilized for fraudulent or illegal purposes, the trial court erred when it "pierced the corporate veil" to impose personal liability against him. We agree and reverse.
It is clear and well-established that a court presiding over maritime matters does have the power to pierce the corporate veil of a corporation in order to reach the "alter egos" of a corporate defendant. Swift and Co. Packers v. Compania Colombiana Del Caribe, S.A., 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950). The law to be applied is federal common law, although the court may import into its decision those principles of state law which it finds both persuasive and appropriate to subsume. Bergesen d.y. A/S v. Lindholm, 760 F. Supp. 976, 986 (D.Conn. 1991); Sabine Towing & Transp. Co. v. Merit Ventures, Inc., 575 F. Supp. 1442, 1445 (E.D.Tex. 1983); See Talen's Landing, Inc. v. M/V Venture, 656 F.2d 1157 (5th Cir.1981).
Under federal common law, only general guidelines or rules have been developed as to when it is appropriate to pierce the corporate veil as each case is sui generis and must be judged within its own context. Sabine Towing, 575 F. Supp. at 1446. The Sabine court stated that:
A trial court should pierce the corporate veil and require a parent corporation to answer for the debts of a subsidiary when the subsidiary conducts business in a manner that clearly indicates that the parent is an alter ego of the subsidiary ... To find an alter ego relationship, the evidence must disclose a pattern of control or domination of a corporation, and that this domination was used to support a corporate fiction ... Once that is established, it will be appropriate to disregard a corporate entity when it appears a corporation was organized for fraudulent or illegal purposes. Furthermore, it is quite clear that the veil should be pierced when it will prevent manifest injustice to third parties.
Id. at 1446 (citations omitted).
There are at least fifteen factors that have been deemed to be relevant in a determination of whether a corporate entity should be disregarded: (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the amount of business discretion displayed by the allegedly dominated corporation; (7) whether the related corporations deal with the dominated corporation at arms length; (8) whether the corporations are treated as independent profit centers; (9) the payment or guarantee of debts of the dominated corporations by other corporations in the group; (10) whether the corporation in question has been properly used by others of the corporations as if it were their own; (11) financing of subsidiary by parent; (12) informal intercorporate loan transactions; (13) *1152 parent and subsidiary's filing of consolidated income tax returns; (14) whether subsidiary's directors act independently in interest of subsidiary rather than in interest of parent; (15) existence of fraud, wrongdoing or injustice to third parties. M. Prusman, Ltd. v. Ariel Maritime Group, Inc., 781 F. Supp. 248 (S.D.N.Y. 1991) citing Wm. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc., 933 F.2d 131, 139 (2d Cir.1991); Sabine Towing, 575 F. Supp. at 1446-48.
Under Florida law, the corporate veil will not be pierced absent a showing of improper conduct. Dania Jai-Alai Palace, Inc. v. Sykes, 450 So.2d 1114 (Fla. 1984); Ally v. Naim, 581 So.2d 961 (Fla. 3d DCA 1991); Sky Lake Gardens Recreation, Inc. v. Sky Lake Gardens, 574 So.2d 1135, 1137 (Fla. 3d DCA 1991). Therefore, the corporate veil will not be penetrated either at law or in equity unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them. Dania Jai-Alai, 450 So.2d at 1120. The mere fact that one or two individuals own and control the stock structure of a corporation does not lead inevitably to the conclusion that the corporate entity is a fraud or that it is necessarily the alter ego of its stockholders to the extent that the debts of the corporation should be imposed upon them personally. Id., quoting Advertects, Inc. v. Sawyer Indus., 84 So.2d 21, 23 (Fla. 1955). Nor does the fact that the corporation's business affairs have been poorly handled, without more, justify piercing the corporate veil. Ally, 581 So.2d at 962-963, citing Advertects, 84 So.2d at 24.
Based upon both federal common law and state law, we are constrained to find that there was no competent substantial evidence adduced at trial to support the piercing of the corporate veil and the imposition of personal liability against Overman. The evidence at the trial viewed in the light most favorable to O.T.C. indicated that:
1. Corporate formalities. Overman was generally unfamiliar with Hilton Oil's Articles of Incorporation; no written minutes were made of the director's meeting wherein Overman orally informed the other directors of his personal loan to the company; and alternate directors acting on behalf of the company's directors authorized Andrew Giovenco to confess judgment on behalf of Hilton Oil in favor of Overman in Overman's foreclosure action on the mortgage and note;
2. Inadequate capitalization. Hilton Oil had no capitalization since all of the funds supplied to the entity came in the form of loans supplied by Overman and/or other corporate entities controlled by Overman. The barge was the only asset of the company;
3. Common or overlapping directors and officers. All of the entities owned and/or controlled by Overman had overlapping owners, officers and/or directors;
4. Use of the same corporate office. Hilton Oil as well as all of the other corporate entities owned and/or controlled by Overman shared the same office, address and telephone number;
5. Informal Loan transactions. Whenever Hilton Oil required funds, which was frequently, Overman routinely borrowed funds from another entity controlled by him or made a personal loan to the company himself. More often than not, such loans were not evidenced by promissory notes from Hilton Oil;
6. Hilton Oil was in effect financed by Overman and/or entities owned or controlled by Overman;
7. With the exception of Overman and two pumpmen for the barge, Hilton Oil had no other employees; and
8. Hilton Oil's directors appeared not to have acted independently in the best of the company but in favor of Overman when they authorized the confession of judgment in Overman's favor in the foreclosure action.
We do not believe that any of the above factors either singularly or collectively justify disregarding the corporate entity. At worse, these factors indicate that Overman operated Hilton in a loose and haphazard manner which certainly would not justify the imposition of personal liability against him. See Ally, 581 So.2d at 962-963. Indeed, we do not believe that it is at all unusual for a private, closely-held corporation to have such poor business practices. The more relevant *1153 inquiry, we think, is whether there was evidence that Hilton Oil was either organized for or being utilized as an instrument for fraudulent, illegal or improper purposes. The trial court apparently concluded that there was such evidence when it found that Overman foreclosed on his mortgage on the barge after it had been grounded and rendered valueless with knowledge of O.T.C.'s debt, the pending insurance claim for the loss of the barge and the arbitration claim against the Honduran government. Without more, we cannot deem such action on the part of Overman to be fraudulent, illegal or improper in nature. There was no competent and substantial evidence to support the trial court's finding that Overman attempted to secrete or shield anticipated proceeds from Hilton Oil's claims from creditors.
Hence, we find that it was error for the trial court to disregard the corporate entity and impose personal liability against Overman. In the absence of such evidence, we do not believe that Hilton Oil's creditors would suffer a fundamental injustice if the veil was not pierced. See Dania Jai Alai, 450 So.2d at 1121.

II. CROSS APPEAL

D. ATTORNEYS' FEES

As its first point on the cross appeal, O.T.C. asserts that the trial court erred when it assessed O.T.C. for a portion of attorneys' fees incurred by Hilton Oil during the arbitration proceeding. O.T.C. argues that there was no legal basis for the imposition of such fees. We agree.
Generally speaking, under the "American Rule" attorneys' fees are not ordinarily recoverable by a prevailing litigant in federal litigation absent statutory authority or contractual agreement. Alyeska Pipeline Serv. Co. v. The Wilderness Soc'y, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). This rule applies with equal force to cases in admiralty as well. Insurance Co. of North Am. v. M/V Ocean Lynx, 901 F.2d 934 (11th Cir.1990), cert. denied, 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991); B.P. North Am. Trading, Inc. v. Vessel Panamax Nova, 784 F.2d 975 (9th Cir.1986), cert. denied, 479 U.S. 849, 107 S.Ct. 175, 93 L.Ed.2d 111 (1986); In re Sause Bros. Ocean Towing, 801 F. Supp. 378 (D.Or. 1991); Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724 (5th Cir.1980). Exceptions to the general "American Rule" have been fashioned both by the judiciary and Congress. One such judicially created exception is bad faith litigation. See Vaughan v. Atkinson, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962). A court may award attorneys' fees if one party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." Foster v. Tourtellotte, 704 F.2d 1109, 1111 (9th Cir.1983), quoting F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). "Bad faith may be found either in the action that led to the lawsuit, or in the conduct of the litigation." McQuiston v. Marsh, 707 F.2d 1082, 1086 (9th Cir.1983), citing Hall v. Cole, 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702 (1973); Dogherra v. Safeway Stores, Inc., 679 F.2d 1293, 1298 (9th Cir.), cert. denied, 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982).
Another exception to the American Rule is the "private attorney general doctrine." Under this doctrine, Congress has made specific and explicit provisions for the allowance of attorneys' fees under selected statutes granting or protecting various federal rights. Alyeska Pipeline Serv., 421 U.S. at 260, 95 S.Ct. at 1623.
Perhaps the most often relied upon exception, is the "common fund" rule. This exception "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense." Boeing Co. v. Van Gemert, 444 U.S. 472, 478, 100 S.Ct. 745, 749, 62 L.Ed.2d 676 (1980). Under this doctrine, fee reimbursement is permitted under the following circumstances:
(1) when litigation indirectly confers substantial monetary or nonmonetary benefits on members of an ascertainable class, and (2) when the court's jurisdiction over the subject matter of the suit, and over a named defendant who is a collective representative of the class, makes possible an *1154 award that will operate to spread the costs proportionately among class members.
Camden I Condominium Ass'n., Inc. v. Dunkle, 946 F.2d 768, 771 (11th Cir.1991).
We conclude that the imposition of attorneys' fees against O.T.C. in the case sub judice cannot be supported under any of the aforementioned theories. That there was neither a contractual nor a statutory basis for an award of attorneys' fees in Hilton Oil's favor is without dispute. The bad faith litigation and private attorney general exceptions were never raised and are clearly inapplicable to this case.
Hilton Oil apparently relies upon the "common fund rule" exception on appeal to sustain its award of attorneys' fees. Hilton Oil argues that since O.T.C. will benefit from the arbitration award, O.T.C. is obligated to pay a proportionate share of the costs and fees incurred by Hilton Oil in obtaining it. Hilton Oil's reliance upon the common fund rule exception is misplaced, we think, for two reasons. First, the benefit of the arbitration award was conferred solely upon Hilton Oil by the arbitrators and not some identifiable class. As we have concluded earlier in this opinion, the arbitration proceeding did not establish or determine O.T.C.'s claim to such funds. Indeed, O.T.C. had to incur attorneys' fees to establish its claim against Hilton Oil in the action below. The mere fact that the arbitration award may have provided Hilton Oil with an asset from which O.T.C. may satisfy its claim does not invoke the common fund doctrine.[7] Second, even assuming arguendo that O.T.C. and other creditors of Hilton Oil could somehow be deemed beneficiaries of Hilton Oil's arbitration award, the court below lacked jurisdiction over the arbitration award and other possible beneficiaries of the award. Therefore, the court below could not proportionately spread the costs and fees among all such potential beneficiaries of the award.
For these reasons, we conclude that there was no basis for an award of attorneys' fees to Hilton Oil. Accordingly, we reverse this award.

E. PREJUDGMENT INTEREST

Finally, we consider O.T.C.'s remaining point on cross appeal which is the denial of prejudgment interest on its damage claim for breach of contract. O.T.C. essentially argues that since this was a claim for liquidated damages, the trial court abused its discretion when it declined to award prejudgment interest. In admiralty cases, prejudgment interest, although within the trial court's discretion, should generally be awarded absent peculiar or exceptional circumstances. City of Milwaukee v. Cement Division, National Gypsum Co., ___ U.S. ___, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); Orduna S.A. v. Zen-Noh Grain Corp., 913 F.2d 1149 (5th Cir.1990); Insurance Co. of North Am. v. M/V Ocean Lynx, 901 F.2d 934 (11th Cir.1990); Todd Shipyards Corp. v. Auto Transp., S.A., 763 F.2d 745 (5th Cir.1985); United States v. Central Gulf Lines, Inc., 747 F.2d 315 (5th Cir.1984); Alkmeon Naviera, S.A. v. M/V Marina L., 633 F.2d 789 (9th Cir.1980). The purpose of prejudgment interest is not to penalize the losing party but to fully compensate the prevailing party for the use of funds found to be rightfully his. See City of Milwaukee, 115 S.Ct. at 2096; Insurance Co. of North Am., 901 F.2d at 942.
Traditionally, some of the peculiar circumstances relied upon by various federal circuits to support the denial of prejudgment interests have been: (1) an improper or unwarranted delay of the action attributable to the plaintiff; (2) a genuine dispute over a good faith claim in a mutual fault setting; (3) equitable considerations which caution against an award; and (4) a damage award substantially less than that claimed by plaintiff. Reeled Tubing, Inc. v. M/V Chad G., 794 F.2d 1026, 1028 (5th Cir.1986). Another circuit has denied prejudgment interest *1155 where the parties have excluded prejudgment interest in their stipulation of damages, Grace Line, Inc. v. Todd Shipyards Corp., 500 F.2d 361, 366 (9th Cir.1974); or where the parties have asserted claims or defenses in bad faith, Darling v. Scheimer, 444 F.2d 514, 515 (9th Cir.1971). Still another circuit has deemed the uncertainty of the claim or damage as a peculiar circumstance. E.g. Sinclair Ref. Co. v. S/S Green Island, 426 F.2d 260, 262 (5th Cir.1970), contra, Ore Carriers of Liberia, Inc. v. Navigen Co., 305 F. Supp. 895, 896-97 (S.D.N.Y. 1969), aff'd, 435 F.2d 549 (2d Cir.1970).
In the recent City of Milwaukee decision, however, the United States Supreme Court has squarely held that neither a good-faith dispute over liability nor the existence of mutual fault are peculiar or exceptional circumstances which will justify the denial of prejudgment interest in an admiralty case. The court further stated that the liquidated/unliquidated damages distinction is of no significance on the issue of prejudgment interest in admiralty cases:
[T]hat distinction has never become so firmly entrenched in admiralty as it has been at law... . Any fixed rule allowing prejudgment interest only on liquidated claims would be difficult if not impossible to reconcile with admiralty's traditional presumption. Yet unless we were willing to adopt such a rule  which we are not  uncertainty about the outcome of a case should not preclude an award of interest. (citations omitted)
City of Milwaukee, 115 S.Ct. at 2096.
The trial court in the instant case denied prejudgment interest to O.T.C. as a matter of equity but made no specific findings to support this and our review of the record failed to disclose a basis to support a denial on this ground. We therefore conclude that it was an abuse of discretion to deny O.T.C. prejudgment interest on its damage award for breach of contract against Hilton Oil. Thus we reverse and remand for the trial court to award prejudgment interest to O.T.C. for this claim. In setting the rate of prejudgment interest in an admiralty case, the court has broad discretion and may look to state law or other reasonable guideposts for a fair level of compensation. See Todd Shipyards, 763 F.2d at 753.

SUMMARY
As to the points raised by Hilton Oil on the main appeal, we conclude that:
1) The defense of frustration is only available to Hilton Oil as of the date of the destruction of the barge by the storm. Therefore, we affirm the award of damages for contract hire to O.T.C. up to the date of the destruction of the vessel by the storm but reverse damages awarded to O.T.C. for contract hire after the destruction of the vessel;
2) affirm the trial court's finding that O.T.C. is not limited in its recovery to a pro rata amount of the award received by Hilton Oil in the arbitration proceeding with Rio Energy and C.A.P.; and
3) reverse the trial court's imposition of personal liability against Overman.
As to the cross appeal, we:
4) reverse the award of attorneys' fees to Hilton Oil; and
5) reverse the denial of prejudgment interest by O.T.C. on its claim for breach of contract and remand with instructions to the trial court to award the same to O.T.C.
Affirmed in part and reversed in part with instructions on the main appeal. Reversed and remanded with instructions on the cross appeal.
NOTES
[1] There is no issue as to the validity of the subcharter agreement between Rio Energy and C.A.P.
[2] Apparently, the asphalt has to be heated into a liquid before it can be discharged from the barge. When the barge arrived in Honduras, the asphalt was at ambient temperature due to the electric motor failure of its fuel pump. For approximately 10-12 days, repairs were made to the heating equipment. Despite such repairs, the parties still disagreed as to whether the barge could achieve the discharge temperature deemed necessary by the Honduran government for safe handling at its facility.
[3] The reasons for the Honduran government's continued detention of the barge and tug are not entirely clear in the record.
[4] This amount included an unpaid sum for a previous charter party between the parties which is not an issue on this appeal.
[5] Indeed, one of O.T.C.'s allegations in the complaint below was that Hilton Oil and Overman misrepresented their activities in the arbitration proceeding to protect O.T.C.'s interests.
[6] Common law vouching is a process whereby a civil defendant notifies a nonparty that a suit is pending against the defendant and that if liability is found, the defendant will look to the vouchee for indemnity and hold him to the findings in that suit. Universal Am. Barge Corp., 946 F.2d at 1135, fn. 2. The need for vouching has largely been eliminated where impleading is available. See 18 Charles A. Wright, et al., Federal Practice and Procedure, § 4452 (1981) ("vouching need be preserved only for cases in which lack of personal jurisdiction or other limitations make impleader unavailable.").
[7] As O.T.C. correctly points out, if we were to apply the common fund doctrine to the facts of this case, any debtor who is successful in securing a monetary award in independent litigation would be in a position to later assess his creditors with a pro rata share of attorneys' fees from such litigation since the creditors would arguably have a fund from which to satisfy their claims against the debtor. Such an anomalous result was surely never envisioned by the common fund rule and we certainly do not embrace it here.