Wayne CADY

v.

IMC MORTGAGE COMPANY et al.

No. 2002–484–Appeal.

Supreme Court of Rhode Island.

Dec. 20, 2004.

Jeffrey S. Michaelson, North Kingstown, for Plaintiff.

Joseph D. Whelan, Providence, for Defendants.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

WILLIAMS, Chief Justice.

As Polonius learned in Shakespeare's Hamlet, eavesdropping on one's enemy often can lead to disastrous results.[1] Harry Struck, in his capacity as president and Chief Executive Officer of RMC Holdings, Inc. (RMC), a wholly owned subsidiary of IMC Mortgage Co. (IMC) (collectively corporate defendants), took it upon himself to surreptitiously listen in on the telephone conversations of certain employees, including the plaintiff, Wayne Cady (Cady or plaintiff). When Struck heard Cady using "salty language" to describe him to a colleague, Struck conspired to terminate Cady, and this case eventually ensued. A jury determined that Cady was terminated without cause and that Struck harmed the plaintiff by secretly listening to his private conversations. Cady, Struck, and the corporate defendants all raise several arguments on appeal.

## I

### Facts and Travel

After several months of negotiations, plaintiff agreed in November 1997 to enter a five-year employment contract with RMC, a mortgage company with headquarters in Cranston, Rhode Island. Struck, the only individual named as a defendant in this case, had been the president and owner of RMC since 1987. Around the time Cady was hired, however, Struck had decided to sell RMC through a stock transaction to IMC, a mortgage company based in Florida. As part of Struck's exit strategy, he hoped to increase RMC's value from $5 million to $40 million. To accomplish this, Struck hired Cady and Frank Tafuno (Tafuno), another colleague familiar with the mortgage business, and retained a former employee, James Hackett (Hackett), to bring RMC from a regional to a national company.

Struck, upon the advice of Tafuno, brought Cady on as the vice president/national sales manager. Cady's primary re-

---

1. William Shakespeare, Hamlet act 3, sc. 4. In act 3, sc. 4, Hamlet suspects his late father's brother—who also happens to be his mother's new husband—is hiding behind a tapestry, listening to their conversation. Hamlet acts upon his suspicions by stabbing blindly through the curtains and killing the courtier, Polonius.

sponsibility was oversight of a nationwide sales team aimed at transforming RMC's nonconforming mortgage sales to a national scale. The employment agreement set Cady's annual base salary at $150,000 and provided for other perks, such as a car allowance and a life insurance policy. In addition, Cady entered an earnout agreement in which he would receive a bonus based on the profitability of the company (earnout bonus).

Cady testified at trial that, because he had a poor opinion of Struck, he was reluctant to leave his previous job and come to RMC. To overcome this apprehension, Tafuno, who had known Cady in a professional capacity for many years, promised Cady that he would act as a buffer between the two men. Prior to signing the employment agreement, Cady met with Struck, Tafuno and Hackett to develop an aggressive sales plan that would expand RMC beyond the nineteen states where RMC was licensed at the time that Cady was hired. Once he began at RMC, Cady contacted several colleagues that he knew from his many years in the mortgage industry and recruited them to work for RMC as regional managers.

Despite the aggressive sales plan conceived by the four principal officers at RMC, sales were significantly lower than anticipated during the first few months of Cady's employment. At trial, Cady testified that the monthly goals set in the sales plan were unrealistic and that the sales were low for many reasons that were out of his control. According to Cady, there was an operations backlog over which he had no responsibility. Loans initiated by his sales representatives were delayed because of underwriting problems. The plaintiff also cited a delay in getting licens-

es for RMC and its employees in the regions where RMC was expanding. In addition, Cady blamed a decision by IMC not to buy loans from RMC as it had agreed to do previously.

In contrast, Struck testified at trial that the goals set in the sales plan were attainable and that Cady was largely to blame for RMC's low sales. According to Struck, Cady hired inferior regional mangers, then failed to train them properly, leading to problems with sales representatives pre-approving loans that could not later be accepted and causing a bottleneck in the operations department. Tafuno concurred with Struck's opinion that Cady's poor performance was largely to blame for RMC's low sales.

In July 1998, Tafuno notified Cady that he and Struck would evaluate the performances of both Cady and Hackett. Tafuno testified that he and Struck evaluated Cady separately, then got together to compare notes and compiled one formal evaluation. On August 6, 1998, Cady received a very low performance evaluation.[2] The written evaluation required Cady to satisfy several conditions within sixty days. In addition, Cady's performance was to be further evaluated every fifteen days. Cady testified that he became very upset upon receiving the evaluation and that he refused to sign it without adding his own comments. According to Cady, the evaluation demanded impossible requirements that he simply would not be able to meet. He concluded that Struck and Tafuno clearly were laying the groundwork to terminate him. Struck testified that he had confidence in Cady at the time of the evaluation and felt that Cady would be able to meet the goals with everyone in-

---

**2.** According to Tafuno's testimony at trial, Tafuno had rated Cady's performance four out of ten and Struck had given him a zero,

leading to a score of two out of ten on the formal evaluation.

volved benefiting financially. Notwithstanding this confidence, however, Struck had spoken to an attorney regarding Cady's employment at RMC before meeting with Cady.

Cady was convinced the evaluation was not the result of his poor performance. Rather, Cady viewed it as retaliation for some negative comments Cady previously had made about Struck—comments that Struck heard while surreptitiously listening in on Cady's phone conversations.[3] Although he did not acknowledge any specific instances of eavesdropping, Struck admitted at trial that the office phone system did include a feature that allowed him to secretly listen in on employees' telephone communications and that he had, in fact, listened to a couple of Cady's conversations.

Ultimately, on October 13, 1998, Cady was terminated from RMC for cause when he was unable to perform up to the standards outlined in the evaluation. Cady filed a civil action against Struck and corporate defendants in the Superior Court on October 29, 1998. In August 1999, while this suit was pending, RMC closed its doors. On appeal, corporate defendants assert that IMC was also forced to shut its doors in 1999 because of world-wide problems in the industry. But no evidence of IMC's alleged closure was presented at trial.

A jury trial was held in March and April 2001. The plaintiff alleged breach of contract against corporate defendants (count 1) and the following counts against all defendants: interference with a contract (count 2); interference with business relations (count 3); violation of the federal wiretapping statute found at 18 U.S.C. § 2510 (count 4); violation of the Rhode Island wiretapping statute found at G.L. 1956 § 12–5.1–13 (count 5); invasion of privacy (count 6); violation of a state criminal statute pursuant to G.L. 1956 § 9–1–2 (count 7); defamation (count 8); intentional infliction of emotional distress (count 9); and negligent infliction of emotional distress (count 10).

At the close of plaintiff's case-in-chief, defendants moved for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure. In the alternative, defendants requested that their pleadings be amended, pursuant to Rule 15(b) of the Superior Court Rules of Civil Procedure, to reflect their contention that many of plaintiff's claims were barred by the exclusivity provision of the

---

**3.** Several former RMC employees testified at trial about conversations they believed Struck had secretly listened to based on his actions after the conversations. Joel Rose, the southeast regional manager, testified that he had complained to Cady one day over the phone about a problem he was having with the underwriting department. Shortly after the phone call ended, Rose received a call from Struck and the head of the underwriting department to clear up the problem. Rose then called Cady back to thank him for addressing his problem so quickly and Cady told him he had not notified anyone about the problem *since their previous conversation.*

Hackett also testified that before Cady was hired, Struck had confronted Hackett about some confidential information, not relating to RMC, that he had been discussing over the phone with someone outside of the company. According to Hackett, Struck was able to repeat parts of the conversation verbatim.

Cady testified about a telephone call he placed on July 23, 1998, complaining about Struck. Cady's complaints arose after he and Struck had an argument in front of RMC employees. Both Cady and Tafuno testified that, while on the phone, they had used "salty language" to describe Struck and his actions toward Cady. Shortly after that conversation, Struck decided that he and Tafuno should evaluate Cady, and Struck gave him a scathing evaluation. Cady alleged the evaluation was in retaliation for the comments he made about Struck over the phone.

Workers' Compensation Act. The plaintiff argued that defendants were precluded from raising this argument at trial for the first time. The defendants countered that the issues addressed subject matter jurisdiction and, therefore, could be raised at any time. The trial justice refused to rule on defendants' motions at that time, and the trial continued. After defendants rested, they renewed their Rule 50 motions. The trial justice again reserved judgment.

After considering the proposed instructions submitted by the parties, the trial justice instructed the jury, and both parties objected to different portions of the trial justice's jury instructions. Thereafter, the jury retired for deliberations with separate verdict sheets for Struck and corporate defendants. During deliberations, the jury sent a question to the trial justice asking him to define "implied consent." The trial justice assembled the jury and advised them

> "that if you find that Mr. Cady has proven a claim of wiretapping, then you must consider whether or not Mr. Cady gave implied consent. Implied consent may be inferred from language or acts which tend to prove that the party knows of or assents to encroachments on the routine expectations that conversations are private. * * * I instruct you that when * * * a private telephone conversation is monitored surreptitiously without authorization or consent, then the exception—the ordinary course of business exception does not apply. If you find * * * that Mr. Cady gave his implied consent, then you must find for the defendants on this particular case."

Cady objected to these instructions.

The jury returned the following verdicts: On plaintiff's breach of contract claim against corporate defendants, the jury found for plaintiff and awarded him $268,528. On the interference of a con-tract claims, the jury found corporate defendants had not interfered with plaintiff's contract, but that Struck had interfered. However, no damages were assessed against Struck on that count. On the claims that defendants violated the federal wiretapping statute, the jury found corporate defendants had violated the statute, but awarded no damages. The jury found Struck had also violated the statute, and awarded plaintiff $50,000 in damages. On the invasion of privacy claims, the jury found corporate defendants had not invaded plaintiff's privacy, but that Struck had. The jury awarded plaintiff $25,000 in damages on the invasion of privacy claim. On the claim that defendants violated a criminal statute pursuant to § 9–1–2, the jury found all defendants in violation of the statute, but only awarded damages of $10,000 on the claim against Struck. The jury found in favor of defendants on the defamation and intentional infliction of emotional distress claims. Finally, the jury saw fit to award Cady $100,000 in punitive damages against corporate defendants and an additional $100,000 in punitive damages against Struck.

The defendants again renewed their Rule 50 motions at the end of the trial, and the trial justice issued a written decision denying their motions, as well as plaintiff's post-trial motions. After the trial justice issued his written decision, the parties appealed, citing many alleged errors. Upon careful consideration, we conclude that the trial justice erred only in instructing the jury on commercial frustration. We affirm every other decision made in the Superior Court. Additional facts will be provided below as needed.

## II

### Judgment as a Matter of Law

First, we address defendants' appeal from the trial justice's denial of their motions for judgment as a matter of law.

██ A trial justice presiding over a jury may grant a party's motion for judgment as a matter of law after a party has been heard fully and there is "no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Super.R.Civ.P. 50(a)(1). A trial justice is required to " 'consider[ ] the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draws from the record all reasonable inferences that support the position of the nonmoving party.' " *Saber v. Dan Angelone Chevrolet,* 811 A.2d 644, 648 (R.I.2002) (quoting *Mellor v. O'Connor,* 712 A.2d 375, 377 (R.I.1998)). A trial justice should not grant a motion for judgment as a matter of law if factual issues remain " 'upon which reasonable persons might draw different conclusions.' " *Id.* (quoting *Mellor,* 712 A.2d at 377). Rather, the issues should be submitted to the jury. *Id.* When reviewing a judgment as a matter of law, this Court is bound by the same standards and rules as the trial justice. *Id.*

**A**

**Workers' Compensation**

██ The parties are unable to agree on the nature of defendants' motion for judgment as a matter of law under the exclusivity provision of the Workers' Compensation Act (WCA). The defendants argue that the question is one of subject matter jurisdiction and thus can be raised at any time. The plaintiff frames defendants' claim as an affirmative defense that only could be considered if the trial justice allowed the party to amend its pleadings under Rule 15(b). The trial justice followed plaintiff's interpretation, believing that to allow defendants to amend their pleadings at that stage of the trial would be extremely prejudicial to plaintiff.

Although this Court has not decided on the issue before us now, the parties have cited to cases in several other jurisdictions that support each of their positions. *Compare Fusaro v. Chase Brass and Copper Co.,* 21 Conn.Supp. 240, 154 A.2d 138 (1956) (concluding that preclusion due to a Workers' Compensation claim is an affirmative defense); *accord Turner Construction Co. v. Hebner,* 276 Pa.Super. 341, 419 A.2d 488 (1980); *with Walters v. Modern Aluminum,* 699 N.E.2d 671 (Ind.Ct.App. 1998) (concluding that asserting the WCA exclusivity provision is a subject matter jurisdiction challenge); *accord McKelvy v. Liberty Mutual Insurance Co.,* 983 P.2d 42 (Colo.Ct.App.1999).

The WCA was enacted in Rhode Island to help employees and employers expedite the handling of tort claims based on an employee's workplace injuries. The exclusivity provision, G.L. 1956 § 28–29–20, ensures that a party who benefits from the WCA will not then turn to common law for additional remedies. The exclusivity provision states:

> "The right to compensation for an injury under [the WCA] * * * and the remedy for an injury granted by [the WCA] * * * shall be in lieu of all rights and remedies as to that injury now existing, either at common law or otherwise against an employer, or its directors, officers, agents, or employees; and those rights and remedies shall not accrue to employees entitled to compensation under those chapters while they are in effect, except as otherwise provided * * *." *Id.*

The WCA provides statutory redress for tort claims that otherwise would be brought at common law and litigated in the trial courts. *See Diaz v. Darmet Corp.,* 694 A.2d 736, 738 (R.I.1997). As the parties acknowledge, the WCA does not ad-

dress any contractual disputes between an employee and his employer, on which many of plaintiff's claims are based. In addition, this Court has held that "certain intangible injuries—such as damage to an employee's reputation or community standing—do not fall within the WCA's purview and no WCA remedy is available to compensate such an injured employee." *Nassa v. Hook–SupeRx, Inc.*, 790 A.2d 368, 375 (R.I.2002). This Court has also held that in some cases the exclusivity provision does not apply to statutory claims. *Folan v. State of Rhode Island Department of Children, Youth, and Families*, 723 A.2d 287, 292 (R.I.1999) (holding that the exclusivity provision does not bar a claim under the State Fair Employment Practices Act or the Civil Rights Act). The majority of plaintiff's claims are beyond the purview of the WCA and, as such, he chose to bring his claim in the Superior Court rather than the Workers' Compensation Court.

If Cady had chosen to bring a claim in the Workers' Compensation Court, the exclusivity provision would apply and plaintiff would be barred from bringing additional claims arising from the same injury in the Superior Court. *Manzi v. State*, 687 A.2d 461, 462 (R.I.1997) (mem.). This did not occur, however, as plaintiff sought relief in the Superior Court. While defendants were welcome to raise this issue as an affirmative defense, we conclude the exclusivity provision does not divest the Superior Court of subject matter jurisdiction and, thus, plaintiff's claims were properly considered by the jury.

It is within the sound discretion of the trial justice to affirm or deny a party's motion to amend the pleadings and this Court will reverse that decision only upon a clear showing that such discretion was abused. *RICO Corp. v. Town of Exeter*, 836 A.2d 212, 217 (R.I.2003). Rule 15(b) provides in pertinent part:

> "Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment * * *. If evidence is objected to at trial on the ground that it is not within the issues made by the pleadings, the court *may allow* the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the objecting party in maintaining the party's action or defense upon the merits." (Emphasis added.)

The trial justice relied on *Murray v. City of New York*, 43 N.Y.2d 400, 401 N.Y.S.2d 773, 372 N.E.2d 560, 563 (1977), in which the New York Court of Appeals allowed an employer to amend its pleadings and raise the exclusivity provision of the New York WCA because the employee "was not permitted to claim surprise or prejudice." The trial justice in this case concluded that to allow defendants to raise the exclusivity provision as an affirmative defense at trial would have resulted in extreme prejudice to plaintiff; because two years had passed since he left RMC, the WCA would have precluded Cady from filing a workers' compensation petition. We agree. The trial justice did not abuse his discretion in denying defendants' motion to dismiss.[4]

---

4. Because we hold the exclusivity provision does not bar plaintiff's claim brought in the Superior Court, we need not consider whether plaintiff's "injury" would be covered under the WCA; whether the burden is on defendant or plaintiff to plead and prove that plaintiff's claims are barred; or whether an amendment of the pleadings can cure the waiver of a WCA defense.

## B
## Federal Wiretapping Statute

 General Laws 1956 § 8-2-38 states that "[i]n every case, civil and criminal, tried in the superior court with a jury, the justice presiding shall instruct the jury in the law relating to the action * * *." The trial justice is free to use his own words, after considering the instructions requested by the parties, as long as the applicable law is correctly stated. *State v. Lynch*, 770 A.2d 840, 846 (R.I.2001). "When evaluating challenges to jury instructions, 'we examine the instructions in their entirety to ascertain the manner in which a jury of ordinarily intelligent lay people would have understood them.'" *Parrella v. Bowling*, 796 A.2d 1091, 1101 (R.I.2002) (quoting *State v. Marini*, 638 A.2d 507, 517 (R.I.1994)).

On appeal, defendant requested judgment as a matter of law, or alternatively requested remand for a new trial, based on the trial justice's allegedly improper jury instructions on the federal wiretapping statute. According to Struck, the improper instructions on the wiretapping charge similarly tainted the G.L.1956 § 9-1-2 (violation of a criminal statute) and invasion of privacy claims brought against him. As noted above, when we review a judgment as a matter of law, we are bound by the same standards and rules as the trial justice. *Saber*, 811 A.2d at 648. We must construe the evidence in the light most favorable to Cady, the nonmoving party, and draw from the record all reasonable inferences that support his position. *Id.*

The federal wiretapping statute, found at section 2511 of title 18 of the United States Code, prohibits "any person [from] * * * intentionally intercept[ing], endeavor[ing] to intercept, or procure[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication * * *." 18 U.S.C. § 2511(1)(a). "Intercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4). The statute defines "electronic, mechanical, or other device" as

"any device or apparatus that can be used to intercept a wire, oral, or electronic communication other than * * * any telephone or telegraph instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or used by a provider of wire or electronic communication service in the ordinary course of its business and being used by the subscriber or user in the ordinary course of its business or furnished by such subscriber or user for connection to the facilities of such service and used in the ordinary course of its business * * *." 18 U.S.C. § 2510(5)(a).

This Court has not yet considered the meaning of the ordinary course of business exception. The federal courts are divided on the issue. The Tenth Circuit Court of Appeals held that "a telephone extension used without authorization *or consent* to surreptitiously record a private telephone conversation is not used in the ordinary course of business." *United States v. Harpel*, 493 F.2d 346, 351 (10th Cir.1974) (emphasis added). The Fifth Circuit, however, disagreed with the holding in *Harpel*, concluding that such a holding would render the exception "completely superfluous." *Briggs v. American Air Filter Co.*, 630 F.2d 414, 419 (5th Cir.1980). The Court in *Briggs* opined that "use of an extension telephone to intercept a phone call by someone who was not authorized to use the phone under any circumstances cannot be used 'in the ordinary course of business.'" *Id.* The *Briggs* Court, however, also determined that it was within the

ordinary course of business for a supervisor to listen in on an employee's conversation long enough to determine whether the employee is disclosing confidential information to a competitor. *Id.* at 420. As such, the Fifth Circuit limited the exception to situations in which the supervisor knows the employee is speaking to an agent of a competitor, the supervisor has reason to believe confidential information is being disclosed, and the supervisor has warned the employee not to disclose business information. *Id.*

■ The trial justice adopted the test set forth in *Harpel* when instructing the jury. He stated that "when a telephone conversation is monitored surreptitiously, without authorization or consent, then it does not fall within the definition of the ordinary course of business." We hold that under the facts of this case, the surreptitious monitoring of personal phone calls without consent is not within the ordinary course of business. Therefore, the trial justice properly instructed the jury. The test set forth in *Briggs* applies to the facts in that case only, a case in which the supervisor had good reason to believe his employee was trading business secrets with former employees. *Briggs*, 630 F.2d at 415–16. In this case, Struck was listening in on private conversations between RMC employees—Struck was not acting in the ordinary course of business and, thus, the jury correctly determined that he had violated the federal wiretapping statute. Therefore, *Briggs* does not apply to this case and we agree that the trial justice properly adopted the standard set forth in *Harpel.*

■ Next, we turn to Struck's assertion that Cady failed to prove the elements of his federal wiretapping, § 9–1–2, and invasion of privacy claims. Specifically, Struck argues that Cady failed to prove that his calls had been "intercepted." Several witnesses testified that Struck had listened in on conversations made from the telephones at RMC. Cady, Hackett, and Rose all testified that shortly after they had a conversation over the phone, Struck behaved in such a way that proved to them he had listened in on their conversation. Struck himself testified that capabilities had been installed on the phone that allowed him to eavesdrop. He and another employee testified that he had done so on several occasions. Viewing the facts through the standard for reviewing motions for judgment as a matter of law, when considering the evidence in the light most favorable to plaintiff, it is clear that Cady satisfied the "intercept" element of the federal wiretapping statute. *Saber*, 811 A.2d at 648. Therefore, we uphold the jury's verdict finding that Struck violated the federal wiretapping statute and invaded Cady's privacy.

### III

### Motions to Amend or Alter Judgment

After the jury returned its verdict, both parties filed several motions in the Superior Court that the trial justice later addressed in a written opinion. Among those were several motions to alter or amend the judgment or, alternatively, to grant a new trial. Rule 59(a) of the Superior Court Rules of Civil Procedure allows a trial justice to grant a new trial "to all or any of the parties and on all or part of the issues." We have held that "for this Court to determine whether a trial justice has abused his or her discretion concerning the grant or denial of a new trial based on an error of law occurring at the trial, we must review that grant and the accompanying trial record before us *de novo*, as we do for other questions of law." *Votolato v. Merandi*, 747 A.2d 455, 460 (R.I.2000).

## A

### Invasion of Privacy & Civil Remedies for Violating a Criminal Statute

██ Because we uphold the federal wiretapping verdict against defendants, we need not address the crux of Struck's arguments relating to the counts of invasion of privacy and violation of a criminal statute pursuant to § 9–1–2. On appeal Struck argues that, even if we uphold the federal wiretapping verdict, the § 9–1–2 verdict should be reversed because the trial justice instructed the jury on the wrong burden of proof.

Section 9–1–2 provides in pertinent part: "Whenever any person shall suffer any injury to his or her person, reputation, or estate by reason of the commission of any crime or offense, he or she may recover his or her damages for the injury in a civil action against the offender, and it shall not be any defense to such action that no criminal complaint for the crime or offense has been made * * *."

The trial justice instructed that if the jury "find[s] by a preponderance of the evidence that the defendants have violated the Federal law as to wiretapping or eavesdropping, then Mr. Cady has suffered injury to his person as a direct and proximate result, and then the defendants would be in violation of [§ 9–1–2]." The defendants would have us hold that the jury should have been instructed that § 9–1–2 would apply only if it determined beyond a reasonable doubt that defendants had violated the federal wiretapping statute.

██ The purpose of § 9–1–2 is to provide an injured party civil remedies regardless of whether the defendant has been convicted of the underlying offense. To prevail in a civil action, a plaintiff is required to prove his case by a preponderance of the evidence. Under § 9–1–2, the burden of proof is related to the cause of action and not the underlying offense. Thus, we hold that the trial justice was correct in instructing the jury on § 9–1–2; the proper standard for civil remedies under the statute is preponderance of the evidence. Accordingly, the trial justice did not err when he instructed the jurors that to find defendants liable under § 9–1–2, they must conclude by a preponderance of the evidence that defendants violated the federal wiretapping statute.

With respect to the invasion of privacy claim, Struck argues that even if we uphold the federal wiretapping verdict, which we do, the trial justice's instructions to the jury were incorrect. As discussed above, the trial justice is free to use his own words, after considering the instructions that the parties requested, as long as the applicable law is correctly stated. *Lynch*, 770 A.2d at 846. We conclude that the jury instructions embodied the invasion of privacy statute and addressed every element. Therefore, we affirm the jury's invasion of privacy verdict against Struck.

## B

### Federal Wiretapping Damages

██ Struck argues on appeal that if this Court determines that the trial justice properly instructed the jury on the federal wiretapping claim, as we have, then the damages awarded by the jury should be reduced. The federal wiretapping statute states that "the court may assess as damages whichever is the greater of (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000." 18 U.S.C. § 2520(c)(2). The trial justice properly instructed the jury that the "amount of dam-

ages need not be calculated to an absolute exactness." *See Butera v. Boucher*, 798 A.2d 340, 350 (R.I.2002). Although Struck failed to object to the jury's award before the trial justice, we have held that " 'a damage award may be disregarded by the trial justice * * * only if the award shocks the conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in assessing the fair amount of compensation to which a party is entitled.' " *Id.* (quoting *English v. Green*, 787 A.2d 1146, 1150 (R.I.2001)).

Clearly, the statute does not "cap" damages at $10,000, as Struck argues. Further, plaintiff submitted evidence of the injuries he suffered as a result of Struck's violation of the federal wiretapping statute. The jury was not required to award plaintiff only $10,000 in damages. Therefore, the jury properly awarded $50,000 based on its assessment of Cady's actual damages.

## C

### Commercial Frustration

The jury returned a verdict in favor of plaintiff on his breach of contract claim against corporate defendants and awarded him $268,528. The five-year employment contract had more than three years remaining when plaintiff was terminated, and the agreement guaranteed an annual base salary of $150,000.[5] The plaintiff contends that the only reason for such a low award is that the jury was improperly instructed to consider RMC's closure roughly a year after he left RMC's employ under the doctrine of commercial frustration.

■ Once again, we will not disturb a jury's award unless "the award shocks the conscience or indicates that the jury was influenced by passion or prejudice or if the award demonstrates that the jury proceeded from a clearly erroneous basis in assessing the fair amount of compensation to which a party is entitled." *Butera*, 798 A.2d at 350 (quoting *English*, 787 A.2d at 1150). Pursuant to the employment contract, Florida law governs any disputes arising under the contract. *See Sheer Asset Management Partners v. Lauro Thin Films, Inc.*, 731 A.2d 708, 710 (R.I.1999) (holding that parties to a contract may chose a particular state's law to govern the contract if there is a real relation between that state and the contract).

■ Under Florida law, the doctrine of commercial frustration is appropriately applied if the following three elements are satisfied: "first, the event giving rise to the claim must be totally unexpected and unforeseeable; second, the risk of the event must not be provided for, either by the language of the [contract] or by custom; and third, the performance of the contract must be impossible or commercially impracticable." *Hilton Oil Transport v. Oil Transport Co., S.A.*, 659 So.2d 1141, 1147 (Fla.Dist.Ct.App.1995). A trial justice "shall instruct the jury in the law relating to the action, and may sum up the evidence therein to the jury whenever he or she may deem it advisable so to do; but any material misstatement of the testimony by him or her may be excepted to by the party aggrieved." G.L. 1956 § 8–2–38.

The trial justice instructed the jury that "if you determine that RMC's closure excused IMC's and RMC's performance, then you must find for IMC and RMC and

---

**5.** Cost of living adjustments would be applied to the base salary of $150,000 in each of the last four years.

must reduce any award for Mr. Cady on his contract claim to either of the dates [*sic*]—the date of the closure of RMC, that being September of 1999." The plaintiff timely objected to these instructions. In his written decision addressing the post-trial motions, the trial justice affirmed the jury's award, stating that commercial frustration was properly applied.

▮ We hold that the trial justice erred in two respects; he wrongfully concluded that the doctrine of commercial frustration applies in this case and, then, proceeded to erroneously instruct the jury under Florida law.

First, the trial justice failed to consider, either during his jury instructions or in his written decision, that the closure of RMC alone did not meet the three elements set forth in the *Hilton Oil Transport* test. On appeal, corporate defendants assert that the award was proper because both RMC and IMC closed their doors in the fall of 1999 due to problems in the mortgage industry based, in part, on problems in the Russian economy. The corporate defendants assert that plaintiff was well aware of IMC's closure. At trial, however, the only evidence of IMC's closure was the empty seat next to corporate defendants' counsel. Even if evidence had been presented, the trial justice failed to mention IMC, which was a party to the employment contract, in his jury instructions. This gave the jury an erroneous basis from which to proceed. To reduce plaintiff's awards due to the doctrine of commercial frustration, the jury would have had to find that both corporate defendants had closed their doors and that, under *Hilton Oil Transport*, they were entitled to have the damages against them decreased because they were commercially frustrated from performing on the contract.

We also hold that the trial justice did not set forth the proper three-part test under *Hilton Oil Transport* in his commercial frustration analysis. The trial justice instructed only that defendants must prove

"[by] a preponderance of the evidence, * * * that its noncontinuation of salary payments to Mr. Cady would have been stopped in any event because RMC closed its business in September of 1999, which made IMC's and RMC's performance so futile that their performance is legally excused. [Corporate defendants'] defense to its noncontinuation of salary payments would have been stopped in any event because RMC discontinued active operations on or about July 1, which made their performance so futile that it would have been legally excused. * * * [I]f you determine that RMC's closure excused IMC's and RMC's performance, then you must find for IMC and RMC and must reduce any award for Mr. Cady on his contract claim to either of the dates [*sic* ]—to the date of the closure of RMC, that being September of 1999."

Thereafter, the trial justice instructed that:

"If you find * * * for Mr. Cady on the breach of contract action, you may award Mr. Cady an amount of money that the preponderance of the evidence shows will fairly and adequately compensate him for his damages. In determining the damages recoverable by Mr. Cady, you shall consider the salary that Mr. Cady would have received for the unexpired term of the contract, the commercial frustration of the contract, if any. And in awarding damages to Mr. Cady for breach of contract, you must not consider any damages for the other claims that Mr. Cady has made * * *. The amount of damages need not be calculated to an absolute exactness.

Rather it must be established to a reasonable certainty."

There was testimony presented at trial that RMC closed because of a problem in the industry that caused Wall Street to stop buying the mortgage-backed securities that the company was selling. Although corporate defendants would have us define the cause that led to RMC's demise as problems in the Russian economy, the problem that led RMC to close its doors was Wall Street's refusal to buy its securities. Wall Street is a volatile and fickle place; it is foreseeable that Wall Street may stop buying certain mortgages at any time. Thus corporate defendants' commercial frustration argument fails to meet the first prong of *Hilton Oil Transport*, 659 So.2d at 1147. In addition, it was not impossible for RMC to continue operating just because it experienced a slump in sales on Wall Street. The corporate defendants failed to meet the third prong of the test as well as the first. *Id.* Furthermore, without evidence that IMC closed its doors, there is no reason why IMC could not have honored its bargain with Cady after RMC closed. Clearly, the doctrine of commercial frustration could not excuse corporate defendants' failure to pay plaintiff the full amount of his base salary once the jury determined that corporate defendants had breached the employment agreement.

■ According to plaintiff, the only expert who analyzed Cady's breach of contract damages was plaintiff's own expert, Alan Feldman (Feldman). Feldman testified that plaintiff was entitled to $686,342, including interest, when considering just

the base salary for the time remaining on the contract. The plaintiff asserts that for the jury to have reached the calculation that it did, the jurors must have relied on the doctrine of commercial frustration and adjusted Feldman's calculations based on an erroneous application of the doctrine. Because the proper award is reducible to a sum certain, we need not remand this issue to the Superior Court for a new trial. Rather, we remand this case and instruct the Superior Court to enter judgment for plaintiff in the amount of $686,342, the sum that he was owed once the jury found that corporate defendants had breached the contract.

The plaintiff asserts two additional arguments to support his appeal on the issue. First, that corporate defendants were required to raise commercial frustration as an affirmative defense and the failure to do so made the jury instructions on the matter improper. Second, corporate defendants had purchased an insurance policy that would cover the company in the case of breach of contract and, therefore, corporate defendants would be able to pay the full damages on plaintiff's breach of contract claim even in the case of commercial frustration. Because of our resolution of the commercial frustration issue, *supra*, we need not address these arguments.[6]

## D

### Duty to Mitigate

■ The corporate defendants argue on appeal that, under Florida law, plaintiff had a duty to mitigate his breach of contract damages. The corporate defendants requested that the trial justice so instruct

---

6. The defendants also argue that we have to decide whether a release and indemnity agreement between IMC and Struck, entered into evidence by plaintiff to prove that defendants knew Cady was wrongly terminated, amounted to Cady's implied consent to allow

commercial frustration to be argued by the parties. The defendants fail to demonstrate that this agreement was made in consideration of IMC's closure and, thus, it has no relevance on the commercial frustration issue.

the jury. The trial justice denied that request, finding that the terms of the employment agreement made it clear that plaintiff had no duty to mitigate.

■■■■ There is no doubt that Florida law imposes a general duty to mitigate damages awarded for breach of contract. *See Juvenile Diabetes Research Foundation v. Rievman,* 370 So.2d 33 (Fla.Dist.Ct. App.1979). However, when the parties agree to a liquidated damages clause in the event of breach, there is no need to mitigate damages. *Venture Homes, Inc. v. Pratt,* 769 So.2d 435, 436 (Fla.Dist.Ct.App. 2000). We agree with the trial justice's conclusion that the terms of the contract did not impose a duty to mitigate.

■■■■ Under both Florida and Rhode Island law, we must consider whether the contract is clear and unambiguous after giving the terms of the contract their plain and ordinary meaning. *Samos v. 43 East Realty Corp.,* 811 A.2d 642 (R.I.2002); *Beans v. Chohonis,* 740 So.2d 65 (Fla.Dist. Ct.App.1999). For a liquidated damages clause to be valid under Florida law, "the damages consequent upon a breach must not be readily ascertainable." *Lefemine v. Baron,* 573 So.2d 326, 328 (Fla.1991).

The corporate defendants argue that, at the time the contract was formed, damages in the case of breach were easily ascertainable by taking Cady's annual base salary of $150,000 and multiplying it by the time left on his contract at the time of breach. What corporate defendants fail to take into account are the potential "earnout" bonuses that Cady would have had the opportunity to earn if RMC had not terminated him. It is unclear how much money Cady could have expected to earn over five years at the time he signed he contract. Struck testified at trial that the number could have been quite large. There is no way the parties could have ascertained the potential damages at the time the contract

was formed; and, therefore, the liquidated damages clause was valid under Florida law. The agreement specifically stated that if Cady were fired without cause, he would be entitled to collect his base salary and he would be freed from his non-competition agreement. Therefore, under Florida law, there was no duty to mitigate damages.

The corporate defendants raise many sub-issues on appeal in an attempt to persuade this Court that Florida law required plaintiff to mitigate the damages. We need not address these arguments because our analysis ends simply by looking at the unambiguous terms of the contract.

**E**

**Punitive Damages**

The jury awarded plaintiff $100,000 in punitive damages against Struck and $100,000 in punitive damages against corporate defendants. After trial, Struck and corporate defendants filed Rule 59 motions to amend the judgments, requesting that the trial justice reduce the punitive damages awarded. The trial justice refused Struck's request but granted corporate defendants' request, finding the award against them was unsupported by any compensatory damages. On appeal, both Struck and Cady claim error with the trial justice's conclusion.

■■■■ Struck appealed the trial justice's ruling, arguing that he erred in instructing the jury on punitive damages. "The standard in Rhode Island for imposing punitive damages is rigorous and will be satisfied only in instances wherein a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages." *Mark v. Congregation Mishkon Tefiloh,* 745 A.2d 777, 779 (R.I.2000) (quoting *Palmisano v. Toth,* 624 A.2d 314, 318

(R.I.1993)). The trial justice must "determine whether the party seeking punitive damages has met this high standard to support such an award, and it is in the discretion of the trier of fact to determine whether and to what extent punitive damages should be awarded." *Id.* at 779–80. It has been held that entitlement to punitive damages under the federal wiretapping statute requires a showing that defendants "acted wantonly, recklessly, or maliciously." *Jacobson v. Rose,* 592 F.2d 515, 520 (9th Cir.1978).

The trial justice instructed the jury:

"You may award punitive damages only if you are satisfied that the defendants, either Mr. Struck or IMC and RMC, any of them acted with any malice, wantonness or willfulness of such an extreme nature that it amounted to criminality which, for the good of society and for a warning to others, that it will be punished."

In his written decision addressing the post-trial motions, the trial justice concluded that the punitive damages awarded against Struck "were neither excessive or egregious." Notwithstanding the hesitation with which Rhode Island courts award punitive damages, the trial justice was well within his rights to instruct the jury on punitive damages and his instructions clearly reflected the law on punitive damages in Rhode Island. *Parrella,* 796 A.2d at 1101. Therefore, we affirm the trial justice's denial of Struck's motion to amend the judgment.

■■■ The plaintiff argues that the trial justice improperly struck the punitive damages awarded against corporate defendants.[7] The corporate defendants counter

that punitive damages are appropriate only when a party has been awarded compensatory damages. Our analysis in this instance is guided by several cases.

We stated that punitive damages should be awarded only where "defendant's conduct requires deterrence and punishment *over and above* that provided in an award of compensatory damages." *Palmisano,* 624 A.2d at 318 (emphasis added). In addition, we have reduced punitive damages found to be excessive in light of the amount awarded in compensatory damages. *See Minutelli v. Boranian,* 668 A.2d 317, 319 (R.I.1995) (reducing punitive damages of $50,000 to $10,000 because $50,000 was excessive in light of compensatory damages amounting to only $20,000). Our rationale in *Minutelli* is helpful to the case before us.

At trial, the jury found no liability against corporate defendants for plaintiff's allegations of interference of a contract, invasion of privacy or defamation. The jury found corporate defendants liable for violating the federal wiretapping statute and for violating a statute pursuant to § 9–1–2, but awarded no damages for either count. The only count against corporate defendants that resulted in compensatory damages was the breach of contract claim, and the verdict sheet expressly prohibited the jury from awarding punitive damages on that count. Based on the instructions on the jury verdict sheet and our holding in *Minutelli,* punitive damages of $100,000 awarded in a case in which no applicable compensatory damages were awarded simply "shocks the conscience [and] indicates that the jury was influenced by passion or prejudice." *Butera,*

---

**7.** The plaintiff argues that the compensatory damages awarded against Struck for violating the federal wiretapping statute and G.L. 1956 § 9–1–2 should be jointly and severally applied to corporate defendants, thus allowing

the jury's punitive damages awarded against corporate defendants to stand. For the reasons discussed *infra,* this joint and several liability argument fails.

798 A.2d at 350 (quoting *English*, 787 A.2d at 1150). Therefore, we affirm the trial justice's decision to strike the punitive damages awarded against corporate defendants.

### F

### Multiple Damages

 As we have stated throughout this opinion, a jury's award shall stand as long as it does not "shock the conscience" and is not influenced by passion or prejudice. *Butera*, 798 A.2d at 350 (quoting *English*, 787 A.2d at 1150). We have held that "[a] plaintiff's recovery against a defendant under one tort theory precludes any duplicative recovery for the same damages under some other tort theory." *Graff v. Motta*, 695 A.2d 486, 492 (R.I.1997) (quoting *Borden v. Paul Revere Life Insurance Co.*, 935 F.2d 370, 383 (1st Cir.1991)); *see also Dyson v. City of Pawtucket*, 670 A.2d 233, 237 (R.I.1996). To preserve this issue for appeal, however, the party objecting to duplicative awards must do so before the jury is dismissed.

 After the jury rendered its verdict, Struck filed a motion to amend the judgment, asserting that multiple awards—specifically the counts of violating of a federal wiretapping statute, violation of a criminal statute pursuant to § 9–1–2, and invasion of privacy—all had been awarded based on Struck's surreptitious interception of plaintiff's telephone conversations. The trial justice concluded, based on the verdict sheets, that "there was no set damage amount, and the jury could have awarded any amount of damages as it thought the facts of the case warranted." He continued that "[a]lthough those counts may [have arisen] out of the same set of facts, there is simply no evidence that the amount of damages awarded to the [p]laintiff were duplicative."

We find the trial justice's reasoning persuasive. In addition, we note that the jury may well have based each of the three awards on separate actions. At trial, Cady introduced evidence of three separate phone conversations that Struck had secretly monitored from his own extension. It is entirely possible that each of the awards was granted based on different incidents. Regardless of the jury's logic, defendants failed to object to the damages at trial and presented no evidence on appeal to suggest that the jury " 'proceeded from a clearly erroneous basis.' " *Butera*, 798 A.2d at 350 (quoting *English*, 787 A.2d at 1150). Thus, we must uphold the award.

### G

### Joint and Several Liability

 After the jury rendered its verdict, plaintiff filed a Rule 59 motion requesting that the trial justice amend the judgment or, in the alternative, that he order a new trial on the issue of liability. The trial justice refused to alter or amend the judgment. As we have clearly explained throughout, a jury's award will stand absent a showing that the award was based on prejudice or passion or that the award shocks the conscience. *Butera*, 798 A.2d at 350.

As discussed above, plaintiff believes the jury awarded multiple damages for the same conduct, and, therefore, that this Court should amend the judgment on those counts. Oddly, plaintiff then supports his argument that corporate defendants should be jointly liable for the damages awarded against Struck by asserting that the jury clearly was not rendering verdicts on duplicative claims, instead suggesting that perhaps the jury did not understand the verdict sheets. Notwithstanding plaintiff's speculation about a

possible misunderstanding of the verdict sheets, he raised no objections to the fact that the jury verdict sheets were separate at any time before the jury was dismissed.

For each count, the jury was asked whether that defendant was liable for the count against it and, if so, whether damages should be assessed and in what amount. Nothing in the separate verdict sheets would have indicated to an ordinarily intelligent lay person that the award granted on one verdict sheet would be the obligation of all defendants. Additionally, if the jury had intended to award damages against corporate defendants for the charge of violating the federal wiretapping statute, which they found corporate defendants had violated, then the jury would not have written "none" on the line left to assess damages. Nothing on the verdict sheets indicated that an award assessed against Struck would be shared by corporate defendants. Thus, we affirm the trial justice's finding that the jury did not proceed from a clearly erroneous basis. Here again, the damage awards must be affirmed.

## H

### Interference with a Contract

The plaintiff also submits that the jury clearly erred when it found that Struck had interfered with Cady's contract but failed to award him damages. He claims that no rational or reasonable juror could find that no damages resulted from the interference. We apply the same deferential standard of review as elsewhere, only disturbing a jury's award if a party demonstrates that it is based on prejudice or an erroneous assessment. *Butera*, 798 A.2d at 350. This Court can think of many circumstances whereby a reasonable jury would conclude that a defendant has interfered with a plaintiff's contract yet not award damages. It is not for this Court to speculate why a jury comes to a specific conclusion, and the absence of any award of damages does not necessarily shock the conscience. *Butera*, 798 A.2d at 350. We will not amend the judgment to add damages on the claim. The jury's verdict regarding plaintiff's interference with a contract claim against Struck is affirmed.

## IV

### Preclusion of Plaintiff's Expert Witness Testimony

The plaintiff proffered the testimony of Joseph Amoroso (Amoroso), who he said was an expert in the mortgage industry. According to plaintiff, Amoroso would testify that Cady's performance was reasonable in the industry, thus showing he was not terminated for cause. Amoroso also was expected to give his opinion on the effect that the non-competition provision would have had on Cady's earnings after he was terminated. After holding a hearing to determine whether the witness was an expert, the trial justice determined that no evidence was submitted to support the witness's opinion and that his testimony would not assist the jury in understanding the mortgage industry any more than the testimony already presented at trial. As a result, the trial justice precluded Amoroso from testifying.

Absent an abuse of discretion, we "will not disturb a trial justice's ruling on the admissibility of expert testimony." *ADP Marshall, Inc. v. Brown University*, 784 A.2d 309, 314 (R.I.2001). A trial justice is permitted to exclude evidence upon a determination that it is needlessly cumulative. *Mills v. Nahabedian*, 824 A.2d 500, 503 (R.I.2003).

The plaintiff admits on appeal that Amoroso's proposed testimony regarding reasonable performance in the industry was

rendered moot when the jury returned a verdict in his favor for breach of contract. Notwithstanding, plaintiff argues that exclusion of the witness's testimony was harmful because the jury was unable to calculate damages beyond his lost base salary and that Amoroso would have discussed the effects of the non-competition agreement. Clearly, many of the other witnesses who testified also were familiar with the industry, and even more familiar with the employment agreement, than Amoroso would have been. Thus, there is no indication that the trial justice abused his discretion in precluding Amoroso's testimony. We affirm his judgment.

## V

### Attorney's Fees and Interest

■ Finally, Cady has brought claims for interest, costs, and attorney's fees. First, plaintiff claims, as he did in his post-trial motions, that he is entitled to attorney's fees based on a provision in the employment contract. The provision provides that "[i]n connection with any legal action to enforce the terms of this Agreement, the prevailing party * * * shall be entitled to receive from the other party all costs incurred in connection therewith * * *." The trial justice properly noted that awarding attorney's fees would be premature and that a hearing was needed to determine what portion of Cady's fees were allotted to which claim. Therefore, we remand this case to the Superior Court to determine attorney's fees and to render a decision on which costs are to be charged.

We need not address plaintiff's assertion that the trial justice erred in failing to attach prejudgment interest to the breach of contract award. According to plaintiff, the jury's award reflects an attempt at calculating damages based on the testimony of plaintiff's expert witness, an economist, who added prejudgment interest to one of his calculations but not another. This Court has adjusted plaintiff's breach of contract award from $268,528 to $686,342, based on plaintiff's expert calculations *including prejudgment interest.*

■ Finally, in an attempt to wring every last penny from defendants, plaintiff argues that the trial justice erroneously altered the judgment against Struck to remove prejudgment interest from the punitive damages. To support his assertion, plaintiff makes a tenuous argument. The plaintiff does not argue the legal validity of Struck's motion. Rather, he alleges that the trial justice's alteration of the judgment was erroneous because Struck raised the issue in his memorandum in support of the motion to alter, but not in the motion itself.[8] Clearly, Cady, Struck, and the trial justice all were aware that interest should not have attached to the $100,000 in punitive damages assessed against Struck. To now reverse the trial justice's decision due to a mere technicality would provide a windfall for Cady. This Court refuses to reach such an inequitable result. In light of this Court's distrust of punitive damages in general, the plaintiff should take the money and run, without stopping to quibble over interest to which he knows he is not legally entitled. Therefore, the trial justice's decision to alter the judgment to remove interest from the punitive damages against Struck is affirmed.

### Conclusion

In conclusion, the trial justice presided fairly over a long and difficult trial. For

---

8. We note that in his motion, Struck expressly says that the Court erred in assessing interest on the judgment in general. He simply fails to specify the punitive damages portion of the judgment.

the reasons stated herein, we affirm the judgment of the Superior Court in part and reverse in part. Out of the many arguments on appeal, we reverse only the trial justice's decision to instruct on the doctrine of commercial frustration. We affirm the trial justice's decisions concerning the workers' compensation defense, the federal wiretapping statute, jury instructions relating to invasion of privacy and the § 9–1–2 claim, punitive damages, duty to mitigate, multiple damage awards, joint and several liability, and preclusion of expert testimony. The plaintiff's judgment against Struck in the amount of $185,000 is duly affirmed. The record shall be remanded to the Superior Court to amend the judgment for plaintiff against corporate defendants in the amount of $686,342 (which includes prejudgment interest) and to determine attorney's fees, costs, and post-judgment interest.